UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
-----------------------------------------------------------------x

MICHAEL WIGGINTON, JR.,

Civil Action No.:

                      Plaintiff,

3:15cv093-NBB-SAA

v.

THE UNIVERSITY OF MISSISSIPPI,
CHANCELLOR DANIEL W. JONES, PROVOST
MORRIS H. STOCKS, DEAN JOHN Z. KISS,
DEAN VELMER BURTON, and CHAIR ERIC
LAMBERT,

                      Defendants.

-----------------------------------------------------------------x

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, MICHAEL WIGGINTON, JR., by and through his attorneys, and for his Complaint against Defendants, the University of Mississippi ("University"), Chancellor Daniel W. Jones, Provost Morris H. Stocks, Dean John Z. Kiss, Dean Velmer Burton, and Chair Eric Lambert, hereby states as follows:

### NATURE OF ACTION

1.      This is a civil action for violations of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, and 42 U.S.C. Section 1983 seeking damages and injunctive relief against Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Dr. Wigginton of rights secured under the Constitution and laws of the United States; wrongfully discriminating against Dr. Wigginton on the basis of race, color, sex, and age; arbitrarily and capriciously denying Dr. Wigginton of property and liberty interests; retaliating

against Dr. Wigginton for his exercise of constitutionally protected speech and for refusing or neglecting to prevent such deprivations and denials to Dr. Wigginton. In addition, Defendants violated related provisions of Mississippi's Constitution and breached Dr. Wigginton's contract with the University, also arising from the same case and controversy as the aforementioned federal law claims. Therefore, these state law claims are properly before this Court pursuant to Article III of the United States Constitution.

## JURISDICTION AND VENUE

2.      Plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC").     *See* Discrimination Charge of Michael Wigginton, attached hereto as Exhibit "A."

3.      Plaintiff received a notice of right to sue letter from the EEOC. *See* EEOC Notice of Right to Sue, attached hereto as Exhibit "B."

4.      This case arises under the United States Constitution, 42 U.S.C. Sections 1983 and 1988, as amended, 29 U.S.C. Section 621, 42 U.S.C. section 2000e *et seq.*, and 42 U.S.C. Section 1981a. This Court has jurisdiction pursuant to 28 U.S.C. Sections 1331 and 1343.

5.      This Court has supplemental jurisdiction over any and all state law claims alleged in this case pursuant to 28 U.S.C. Section 1367(a), as they form part of the same case or controversy under Article III of the United States Constitution.

6.      The facts and issues of Dr. Wigginton's state law claims are inextricably intertwined with those of his federal law claims. This Court is an appropriate venue for these cause of action pursuant to 28 U.S.C. 1391(b)(1) and (b)(2). The actions complained of took place in this judicial district; evidence and employment records relevant to the allegations are maintained in this judicial district; Dr. Wigginton

2

would be employed in this judicial district but for the unlawful actions and practices of the Defendants; and the University is present and regularly conducts affairs in this judicial district.

## PARTIES

7.      Dr. Wigginton, a Caucasian male born on January 1, 1949, retired from the United States Air Force where he served as a Security Police Military Dog Handler in South Vietnam.  Subsequently, Dr. Wigginton joined the New Orleans Police Department.  Later, he joined the Louisiana State Police where he served on the narcotics and criminal intelligence divisions. Thereafter, Dr. Wigginton became a Special Agent at the United States Department of Justice, Department of Drug Enforcement Administration ("DEA") where he was tasked with investigating international drug smuggling organizations. After five years with the DEA, Dr. Wigginton joined the United States Customs Service Office of Investigations as part of the Office of the Special Agent in Charge in New Orleans. There, Dr. Wigginton was assigned to the Air and Marine Smuggling Unit, Office of Internal Office, Special Operations Unit, Exodus Investigations Unit, and the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force.

8.      Dr. Wigginton began his doctoral studies in Administrative Justice at the University of Southern Mississippi. After earning his doctorate, Dr. Wigginton was employed as an adjunct professor by Tulane University and Southeastern Louisiana University. In 2006, Dr. Wigginton became an Assistant Professor at Southeastern Louisiana University in the Department of Criminal Justice and Sociology.

9. In 2008, the University's Department of Legal Studies at its School of Applied Sciences contracted Dr. Wigginton as a tenure-track assistant professor.

10. At the University, Dr. Wigginton also served as the Graduate Coordinator for the Department of Legal Studies and Executive Cohort Program Coordinator.

11. The University is a public university organized and administrated under a charter from the State of Mississippi.

12. Currently, Daniel W. Jones is the Chancellor of the University.

13. Chancellor Jones was recently ousted from his position at the University and must retire in June 2017.

14. Morris H. Stocks is the Provost of the University.

15. John Z. Kiss is the Dean of the Graduate School at the University.

16. Velmer Burton is the Dean of the School of Applied Sciences at the University.

17. Eric Lambert is the Chair of the University's Department of Legal Studies.

18. At all relevant times, Defendants acted under color of state law.


### CLAIM BACKGROUND

#### A.

### DR. WIGGINTON EXCELED AS A TENURE-TRACK ASSISTANT PROFESSOR FOR THE UNIVERSITYAND RECEIVED THE HIGHEST PRAISE IN ANNUAL REVIEWS

19. The University hired Dr. Wigginton on August 21, 2008 as a tenure-track Assistant Professor of Criminal Justice in the Legal Studies Department,

School of Applied Sciences. At the start of his employment, Dr. David H. McElreath was the Chair of the Legal Studies Department.

20.    On April 29, 2009, Chair McElreath submitted Dr. Wigginton's first annual review. The University's annual reviews evaluate faculty members in four separate categories: (1) Teaching, (2) Research, (3) Service, and (4) Overall Evaluation. *See* Chair McElreath's April 29, 2009 First Annual Review, attached hereto as Exhibit "C."

21.    In his April 29, 2009 review of Dr. Wigginton, Chair McElreath made the following findings: (1) Teaching – "Dr. Wigginton is an outstanding faculty member who has demonstrated quality in and outside the classroom in support of the student learner . . . His students have gone out of their way to tell me how much they enjoy his classes . . . Indeed, Dr. Wigginton's student evaluations continually exceed the average for professors at the University of Mississippi;" (2) Research – "Dr. Wigginton maintains a strong record of research and scholarship especially in the area of Homeland Security. He is under contract as a co-authored [*sic.*] for Introduction to Terrorism (K&M Publishers), has presented at various professional conferences and continues to guide and assist graduate students as they enhance their research abilities. He presented a scholarly paper at the October/2008 Southern Criminal Justice Association Regional Conference and is currently preparing a scholarly article for journal publication;" (3) Service – "Dr. Wigginton is a member in good standing with the American Society of Southern Criminal Justice Association, American Society of Criminal Justice Sciences, Mississippi Gang Investigator's Association, and the American Society of Public Administration. Moreover, he is a long time member of the Fraternal Order of Police, and the Federal Law Enforcement Officers Association. In addition, he has obtained an Outside Speaker regarding 'Border Security' to speak [to]

the UM student body along with the community. Furthermore, Dr. Wigginton has recruited students for the traditional criminal justice graduate program in addition to the newly created cohort graduate program. Lastly, he acts as a liaison between the law enforcement and homeland security communities and the University of Mississippi;" (4) Overall Evaluation – "OUTSTANDING!!!! . . . Dr. Wigginton has met and exceeded all academic related expectations during this evaluation period and is, in the opinion of the Chair, making adequate progress toward the achievement of both tenure and promotions." *See id.*

22. On June 29, 2010, Chair McElreath issued Dr. Wigginton's annual review for the 2009-2010 academic year. According to this review, Chair McElreath made the following findings: (1) Teaching – "Dr. Wigginton is an outstanding teacher who brings together all elements of education for his students . . . his performance in the classroom reflects his expertise, experience and preparation. In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of teaching for both the awarding of promotion and tenure with the University of Mississippi;" (2) Research – "Dr. Wigginton is an outstanding researcher/author/colleague who has demonstrated his talents as a researcher/scholar. His publication record continues to advance and from working with him on several projects, I have been impressed with his attention to detail . . . He has been very active in grant development, submission and supervision. In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of research/scholarship for both the awarding of promotion and tenure with the University of Mississippi;" (3) Service – "Dr. Wigginton is a leader in service to the University and professional community. He instructs in the FBI Command College, for the regional law enforcement academy, he has served on boards and committees, both internationally to the University and external

to the University. Of specific note, Dr. Wigginton serves on several Master of Criminal Justice thesis committees as well as serving as committee chair . . . In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of service for both the awarding of promotion and tenure with the University of Mississippi;" (4) Overall Evaluation – "There are those times in the academic career of a chair that he or she is privileged to work with a faculty member that brings to the University those qualities that make them special. Their concern for students, their commitment to the principles of education to include but not limited to quality education separate them from the majority of our profession. Those faculty who not only go the extra mile, in service, scholarship and by providing those intangibles that make them a true colleague but will go the distance. I am fortunate to serve with five tenured/tenured track faculty members who I feel demonstrate those qualities and more. Dr. Wigginton is one of those five. Without question, each could chair this department. Thus, in summary, in the opinion of the Chair, Dr. Wigginton continues to exceed all expectations for advancement in rank and awarding of tenure at the University of Mississippi." *See* Chair McElreath's June 20, 2010 Annual Review, attached hereto as Exhibit "D."

23.     Dr. Wigginton also noted his additional scholarly endeavors during this school year, including: "writing two chapters for an Introduction to Law Enforcement text book to be published in 2011. In addition, [Dr. Wigginton was] awarded a $10,500 grant from the University of Mississippi Center for Intelligence Studies to fund research of the Texas Border Sheriff's Coalition's ability to police and secure the Texas-Republic of Mexico's border." *See id.*

24.     On April 18, 2011, Interim Chair Dr. Stephen Lee Mallory issued Dr. Wigginton's review for the 2010-2011 academic year. According to the review, Interim Chair Mallory made the following findings: (1) Teaching – "Dr. Wigginton is

an outstanding teacher who brings together all elements of education for his students. He demonstrates quality inside and outside the classroom . . . In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of teaching for both the awarding of promotion and tenure with the University of Mississippi;" (2) Research – "Dr. Wigginton is an outstanding research/author/colleague who has demonstrated his talents as a research/scholar. His publication record continues to advance and from working with him on several projects, I have been impressed with his attention to detail . . . He has assisted students by helping them prepare their thesis/Intelligence Estimates for their Capstone Project as part of their studies at the Center for Intelligence Studies. He was worked with other faculty, assisting them as they strengthen their research and scholarship abilities. He has been very active in grant development, submission and supervision. . . In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of research/scholarship for both the awarding of promotion and tenure with the University of Mississippi;" (3) Service – "Dr. Wigginton is a leader in service to the University and professional community. He instructs in the FBI Command College, for the regional law enforcement academy, he has served on boards and committees, both international to the University and external to the University. Of specific note, Dr. Wigginton serves on several Master of Criminal Justice thesis committees as well as serving as committee chair. Additionally, he has been directly responsible for the success of the Master of Criminal Justice Cohort program. In addition, Dr. Wigginton has been appointed as the department's Graduate Coordinator and is actively involved in promoting the program along with recruitment. Dr. Wigginton also donates his time to serve as an Instructor for the Oxford Police Department Reserve Academy. In addition, he has served as a training Advisor for Marshall County Sheriff's Office. Dr. Wigginton also serves on the School of Applied

Sciences Curriculum and Policy Committee. In addition, he has co-hosted the University of Mississippi's Homeland Security Training Conference. In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of service for both the awarding of promotion and tenure with the University of Mississippi;" (4) Overall Evaluation – "Dr. Wigginton in the Chair's opinion is making adequate progress toward meeting the expectations for tenure-track faculty. He is well respected by both faculty and students and is a tremendous asset to our department. His extensive experience is apparent in the classroom and his students often praise his classes as great learning experiences. His research is cutting edge and is likely to give him national recognition. Service is an area where Dr. Wigginton excels whether as an invited speaker/instructor or as a member of university committees. He will continue to be a valuable asset to the School of Applied Sciences and the University." *See* Interim Chair Mallory's April 18, 2011 Annual Review, attached hereto as Exhibit "E."

      25.    On April 16, 2012, Interim Chair Mallory issued Dr. Wigginton's review for the 2011-2012 academic year. According to the review, Interim Chair Mallory made the following findings: (1) Teaching – "Dr. Wigginton is an outstanding teacher who brings together all elements of education for his students . . . In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of teaching for both the awarding of promotion and tenure with the University of Mississippi. During this evaluation period, Dr. Wigginton has taught two graduate along with two undergraduate classes for a total of four classes each semester. Moreover, during the evaluation period he was evaluated [by] department tenured faculty members who reported that his abilities were exception;" (2) Research – "Dr. Wigginton is an outstanding researcher/author/colleague who has demonstrated his talents as a researcher/scholar. His publication record continues to advance and from working with

9

him on several projects, I have been impressed with his attention to detail . . . In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of research/scholarship for both the awarding of promotion and tenure with the University of Mississippi. During this evaluation period Dr. Wigginton attended two professional conferences where he presented research papers regarding homeland security and criminology topics. In addition, Dr. Wigginton has published two articles in a peer-reviewed professional journals [*sic.*] along with coauthoring a textbook during the evaluation period;" (3) Service – "Dr. Wigginton is a leader in service to the University and professional community. He instructs in the FBI Command College, for the regional law enforcement academy, he has served on boards and committee, both international to the University and external to the University. Of specific note, Dr. Wigginton serves on several Master of Criminal Justice thesis committees as well as serving as committee chair. Additionally, he has been directly responsible for the success of the Master of Criminal Justice Cohort program. In addition, Dr. Wigginton has been appointed as the department's Graduate Coordinator and is actively involved in promoting the program along with recruitment . . . Dr. Wigginton also serves on the School of Applied Sciences Curriculum and Policy Committee. In addition, he has co-hosted the University of Mississippi's Homeland Security Training Conference. In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of service for both the awarding of promotion and tenure with the University of Mississippi. In addition, he is the department's Graduate Program Coordinator along with being the Executive Cohort Program Manager. He is currently serving on the Board of Directors for the University of Mississippi's Veterans Association;" (4) Overall Evaluation – "Dr. Wigginton in the Chair's opinion is making excellent progress toward meeting the expectations for tenure-track faculty. He is well respected

by both faculty and students and is a tremendous asset to our department. His extensive experience is apparent in the classroom and his students often praise his classes as great learning experiences. His research is cutting edge and is likely to give him national recognition. Professionals in the field often cite his ability as an instructor during professional training. Service is an area where Dr. Wigginton excels whether as an invited speaker / instructor or as a member of university committees. He will continue to be a valuable asset to the School of Applied Sciences and the University." *See* Interim Chair Mallory's April 16, 2012 Annual Review, attached hereto as Exhibit "F."

26.  On April 11, 2013, Interim Chair Mallory issued Dr. Wigginton's review for the 2012-2013 academic year.  According to this review, Interim Chair Mallory made the following findings: (1) Teaching – "Dr. Wigginton is an outstanding teacher who brings together all elements of education for his students. He demonstrates quality in and outside the classroom . . .As an advisor to a large number of students, he continues to be a true mentor, not only in support of the student academic experience, but also in support of their career decisions . . .Due to his standing with the profession, students have a higher probability of employment. Dr. Wigginton has been nominated for the Thomas A. Crowe Award for the School of Applied Sciences for the Spring 2013 semester. In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of teaching for both the awarding of promotion and tenure with the University of Mississippi;" Research – "Dr. Wigginton is an outstanding researcher/author/colleague who has demonstrated his talents as a researcher/scholar. His publication record continues to advance and from working with him on several projects . . . Dr. Wigginton has been very active in grant development, submission and supervision. In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of research/scholarship for both the awarding of promotion and

tenure with the University of Mississippi. During this evaluation period, Dr. Wigginton attended two professional conferences where he presented research papers regarding homeland security and criminology topics. In addition, Dr. Wigginton has published two articles in a peer-reviewed professional journal along with coauthoring a textbook during this evaluation period;" (3) Service – "Dr. Wigginton is a leader in service to the University and professional community. He instructs in the FBI Command College, for the regional law enforcement academy, served on boards and committees, both international and national, and to the University and external to the University . . . Dr. Wigginton also donates his time to serve as an Instructor for the Oxford Police Department Reserve Academy. He served as a training instructor for Marshall and Coahoma County Sheriff's Office in establishing their Street Gang Intelligence Unit. In the opinion of the Chair, Dr. Wigginton meets or exceeds all expectations in the area of service for both the awarding of promotion and tenure with the University of Mississippi. In addition, he is the department's Graduate Program Coordinator along with being the Executive Cohort Program Manager. He is currently serving on the Board of Directors for the University of Mississippi's Veterans Association;" (4) Overall Evaluation – "I met with Dr. Wigginton on April 11, 2013 and discussed his evaluation. Dr. Wigginton in the Chair's opinion is making excellent progress toward meeting the expectations for tenure-track faculty. He is well respected by both faculty and students and is a tremendous asset to our department . . . His research is cutting edge and is likely to give him national recognition . . . Service is an area where Dr. Wigginton excels whether as an invited speaker/instructor or as a member of university committees. He will continue to be a valuable asset to the School of Applied Sciences and the University." *See* Interim Chair Mallory's April 12, 2013 Annual Review, attached hereto as Exhibit "G."

27.     Dr. Wigginton also noted in this review his additional scholarly endeavors during this school year.  He indicated, "I am coauthoring another text book titled 'Principles of Emergency Management' and researching several professional journal articles."  Notably, Dean Burton signed off in agreement with this annual review. *See id.*

**B.**

**THE MISSISSIPPI BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING'S POLICIES AND BYLAWS EXPRESSLY REQUIRE CONSIDERATION OF "DIVERSITY METRICS" FOR FACULTY PERFORMANCE EVALUATIONS**

28.     The Mississippi Board of Trustees of State Institutions of Higher Learning ("Board") was established to govern the Mississippi Institutions of Higher Learning ("IHL System"), which is a system of eight universities including the University.

29.     According to the June 19, 2014 Board Policy and Bylaws, the Board expressly recognizes a "high priority" to be assigned to its "Diversity Statement" (Section 102.06), which supports the goal of increasing the employment of underrepresented individuals in administrative, faculty and staff positions.  *See* the Board's Policies and Bylaws, attached hereto as Exhibit "H."

30.     The Board's Diversity Statement compels the chancellor and institutional executive officers of the University to incorporate an "appropriate diversity metric" into performance evaluations within their units. In addition, it mandates that "diversity metrics" also be considered in evaluating the established diversity goals within the University and other organizations. *See id.*

### C.

### DEAN VELMER BURTON JOINED THE UNIVERSITY AND IMPLEMENTED OPENLY DISCRIMINATORY EMPLOYMENT POLICIES THAT CREATED A HOSTILE WORK ENVIRONMENT FOR AGING AND CAUCASIAN STAFF

31.     On August 16, 2012, the Mississippi Board of Trustees of State Institutions of Higher Learning hired Velmer S. Burton as Dean of Applied Sciences and Professor of Social Work and Legal Studies at the University. He was provided a salary of $190,000.00 and tenure.

32.     Dean Velmer was previously employed as Chancellor of the University of Minnesota, Crookston. In the middle of the semester in 2004, he abruptly resigned less than a year into this position due to backlash against his policies. Thereafter, he returned to a non-supervisory teaching position.

33.     At the University, Dean Burton implemented blatantly discriminatory policies and procedures that created a hostile work environment based upon race and age in accordance with his own personal prejudices and beliefs which furthered the Board's explicitly discriminatory policy directives.

34.     Sometime in 2012, Dean Burton admitted to a former assistant dean at the University that he intended to "rid the school of older professors" and would no longer hire "older" faculty members.

35.     In perpetuation of this newly discriminatory environment created by Dean Burton, Associate Professor of Criminal Justice Linda Keena commented to her graduate classes that the faculty was comprised of "too many old, white men" on multiple occasions and also made similar statements during faculty meetings.

**D.**

## DEAN BURTON THREATENED DR. WIGGINTON WITH DENIAL OF TENURE IF HE FAILED TO BLINDLY SUPPORT NEWLY APPOINTED CHAIR LAMBERT

36.     Dr. Eric G. Lambert joined the University in 2013 and was one of the first new hires to the School of Applied Sciences under Dean Burton's regime. He was immediately appointed as Chair of the Department of Legal Studies.

37.     Dr. Lambert's tenure review was fast-tracked. The Department faculty voted on his tenure at the beginning of the 2013 academic year. At the outset, Dean Burton attempted to intimidate and bully the faculty by stating, "if the department does not vote for tenure for Eric Lambert, I do not see how anyone will ever be granted promotion or tenure from this department in the future." Shortly thereafter, Dr. McElreath confronted Dean Burton by asking, "are you trying to intimidate us?" At that point, Dean Burton stormed out of the meeting.

38.     Collectively, the Department voted against Dr. Lambert's tenure application, as did Dr. Wigginton. Nevertheless, Dr. Lambert was awarded tenure retroactive to his date of hire.

**E.**

## THE UNIVERSITY'S TENURE AND PROMOTION PROCEDURE

39.     According to the bylaws and procedure of the School of Applied Sciences, the Department of Human Resources must notify the department chair of all faculty eligible for tenure consideration by May 15 of the calendar year. According to Dr. Wigginton's contract, he was eligible for tenure review and promotion during his sixth full year of employment with the University. *See* the University, Board of Applied Sciences Tenure and Promotion Policy and Procedures, attached hereto as Exhibit "I."

40.     Thereafter, the department chair must meet with the candidate to review materials that will be submitted in the candidate's dossier. The dossier is to be completed and submitted by the candidate on September 1 of the calendar year. *See id.*

41.     The candidate must provide the department chair names and contact information of five external reviewers. The chair then selects three of these reviewers from the candidate's recommendation list and two from his/her own list. Thereafter, the department chair provides confirmation of the five external reviews by August 15 of the calendar year. The external reviewers receive the candidate's dossier by September 15 of the calendar year. *See id.*

42.     By October 15 of the calendar year, all external review letters must be received and included in the candidate's dossier. The department chair must make the candidate's dossier and external review letters available to all tenured faculty by this date. *See id.*

43.     By November 1 of the calendar year, the candidate's department must meet to vote by secret ballot on the candidate's promotion/tenure. The ballots are submitted to the department chair. *See id.*

44.     By November 21 of the calendar year, the department chair must provide the candidate with a written recommendation including a report on the faculty vote. Thereafter, the candidate's dossier must be made available to the Dean of the School of Applied Sciences. *See id.*

45.     By December 5 of the calendar year, the School of Applied Sciences Dean's Advisory Committee must meet and evaluate the candidate's dossier. and submit a written recommendation to the dean. The written recommendation must include a report of the vote by the advisory committee. *See Id.*

46.     By December 10 of the calendar year, the dean's recommendation must be provided to the candidate and the Dean of the Graduate School. By January 15, the Dean of the Graduate School must provide their recommendation to the Provost/Vice Chancellor for Academic Affairs. *See id.*

47.     The Tenure and Promotion Review Committee is charged with reviewing all applications at the time that they are sent to the Provost/Vice Chancellor for Academic Affairs. The review committee shall give closer scrutiny to an application where there are conflicting recommendations. The report then goes to the Provost/Vice Chancellor for Academic Affairs. *See* the University's Tenure and Promotion Review Policy, attached hereto as Exhibit "J."

48.     By March 20, the Provost/Chancellor must provide a recommendation to the Chancellor. After issuance of this recommendation, a further appeal may be made by the candidate to the Tenure and Promotion Appeals Committee, including a request for a hearing on the issues. *See id.*

49.     By March 31, or two weeks after the issuance of a recommendation by the Tenure and Promotion Appeals Committee on appeal, the Chancellor must take his or her final action. *See id.*

50.     The Board's approval is necessary for the final award of tenure or involuntary separation of an employee. *See id.*

## F.

## DR. WIGGINTON'S EXTERNAL REVIEWERS

51.     As part of Dr. Wigginton's application for tenure and promotion during the 2013-2014 academic year, five external reviewers were chosen: (1) Dr. Lisa Nored, Director of the School of Criminal Justice, The University of Southern Mississippi; (2) Dr. Greg S. Weaver, Associate Professor and Program Director of

Sociology, Auburn University; (3) Dr. Ida Johnson, Professor of Criminal Justice, The University of Alabama; (4) Dr. David Gladstone, Associate Professor, The University of New Orleans; and (5) Dr. Pillip Carlan, Professor and Assistant Chair of the School of Criminal Justice, The University of Southern Mississippi. Of these external reviews, three – Dr. Nored, Dr. Weaver, and Dr. Johnson – were expressly approved by Interim Chair Mallory and Associate Dean Mark Lofton.

52.     According to Dr. Johnson's external recommendation dated September 10, 2013, "Dr. Wigginton's file, a representation of his work in teaching, scholarship, and service is quite impressive. I am confident that the high standard and integrity he sets for himself will continue in the future . . . Dr. Wigginton's unwavering commitment to student learning and engagement is reflected in his high student evaluation scores at both the undergraduate and graduate levels . . . His evaluations speak highly of his instructional presentation, organizational skills, and commitment to student learning. His nomination for the Thomas Crowe Award supports his outstand[ing] teaching record and mentoring relationships he has developed with his students. . . . Dr. Wigginton's scholarship addresses policies relative to terrorism, homeland security, and transportation and border patrol. His development of new ideas on contemporary issues presents both theoretical and practical significance for the study of terrorism and homeland security . . . He is to be commended for the publication of three textbooks. From this perspective, his outstanding textbook publication record exceeds the tenure and promotion textbook publication requirements at many universities . . . He has sustained a high level of research productivity in his specialty research area of terrorism and homeland security . . . Dr. Wigginton has demonstrated strong research skills in textbook writing, grant writing, and conference presentation. He continues to pursue excellence in scholarship as demonstrated by the manuscripts

accepted for publication and manuscripts under review . . . Since 2008, Dr. Wigginton has been involved in good academic citizenship at the departmental and professional level . . . Dr. Wigginton is the Executive Cohort Program (ECP) Coordinator and the Legal Studies Graduate Coordinator. His appointment to these important positions in the Department of Legal Studies demonstrates that his colleagues value his knowledge, expertise, and commitment to fulfilling the responsibilities associated with these positions . . . I support Dr. Wigginton's tenure and promotion to the rank of Associate Professor. He has demonstrated proficiency in teaching, scholarship, and service at the University of Mississippi." *See* Dr. Johnson's September 10, 2013 External Review, attached hereto as Exhibit "K."

53.      According to Dr. Gladstone's external recommendation dated September 12, 2013, "Dr. Wigginton's extraordinary career in the field of law enforcement is another factor that I cannot help think makes him popular with students, many of whom are no doubt interested in law enforcement careers . . . Dr. Wigginton has co-authored three textbooks relating to his field and he has been nominated for an outstanding professor award in the School of Applied Sciences. Dr. Wigginton also appears to have played a significant departmental role in developing new courses and restructuring the curriculum. Last but not least, his interest in student advising and research supervision is evidenced from the sizeable number of thesis committees on which he has served . . . For an assistant professor with an unusually high level of university service I believe Dr. Wigginton has made an impressive contribution to criminal justice scholarship. By my count he has authored or co-authored five articles that have appeared or will soon appear in peer-reviewed journals, co-authored three textbooks in the field of criminal justice with a fourth in the process, and presented ten papers at professional meetings or conferences, among his other notable academic

achievements. I believe Dr. Wigginton's production of scholarship is in line with the legal studies department's tenure and promotion guidelines, but I also believe his research output is all the more remarkable given the heavy administrative load he assumed since beginning at the University of Mississippi in 2008 . . . Dr. Wigginton's level of service to the university and the legal studies department is, I believe, both very impressive and also very rare for an assistant professor . . . What is hard to miss about Dr. Wigginton's record is the way he has combined his long history of work in the area of law enforcement with a budding career as an academic in the area of legal studies and criminology . . . Because of his many years of service in the field of law enforcement, Dr. Wigginton can, it seems to me, ask questions and undertake research that may not be obvious to those who lack as extensive a law enforcement background. . . . In my view, Dr. Wigginton has a very bright future ahead of him as an effective classroom instructor, an able and effective administrator, and a hardworking scholar with much to contribute to the field in terms of research and service. I believe Dr. Wigginton has not only met the tenure and promotion criteria of the Legal Studies Department at the University of Mississippi, but would meet similar department criteria at other educational institutions as well." *See* Dr. Gladstone's September 12, 2012 External Review, attached hereto as Exhibit "L."

54. According to Dr. Nored's external recommendation dated September 13, 2013, Dr. Wigginton was "a versatile faculty member who has excelled in the areas of teaching, research and service. Dr. Wigginton has developed a balanced and consistent record of accomplishment in all categories despite time-consuming service obligations. He is to be commended for his record thus far . . . Collectively, Dr. Wigginton's record is impressive and appropriate for this stage of his career. Based on my review of the documents provided, I would recommend Dr. Wigginton for

promotion and tenure without hesitation . . . By all accounts, Dr. Wigginton appears to be a versatile and exceptional classroom instructor . . . To date, Dr. Wigginton has published three (3) peer-reviewed journal articles in well-respected publication outlets. Two manuscripts have been submitted for publication and two additional manuscripts are purported to be in progress. In addition to peer-reviewed publications, Dr. Wigginton has co-authored three text books in his respective area of expertise and is currently under contract to complete a fourth co-authored text [en]titled '*Principles of Emergency Management.*' Dr. Wigginton has established a record of presenting his research at professional conferences and other outlets. Dr. Wigginton has made six presentations on a national and regional scale at the Annual Meetings of the Southern Criminal Justice Association (SCJA) and the Academy of Criminal Justice Sciences (ACJS). Dr. Wigginton has been successful at securing external funding to support his research. To date, Dr. Wigginton has secured approximately $610,000.00 in funding . . . Dr. Wigginton has been actively and consistently engaged in service throughout his career at UM." *See* Dr. Nored's September 13, 2012 External Review, attached hereto as Exhibit "M."

55. Dr. Weaver stated in his external recommendation dated September 16, 2013, "it is my opinion that Dr. Wigginton has more than surpassed the threshold for granting tenure and promotion. His efforts in terms of research, teaching, and service/administration are exemplary . . . If Dr. Wigginton were a member of my department, he would be an invaluable asset who, in my opinion, would definitely be eligible for tenure at Auburn. In examining Dr. Wigginton's research, the overall body of his work reflects his academic interests and prior experience, broadly defined in terms of law enforcement and first responders . . . His involvement with research grants is impressive and is further testament to his ability. I am somewhat envious of his

success in bridging the academic – practitioner gap that is all too prevalent in research. In terms of teaching, it is apparent that Dr. Wigginton excels in this area . . . His work in developing the Executive Cohort Program and as a graduate director in the department exceeds the expectations consistent with senior faculty at most institutions . . . I believe without reservation that Dr. Wigginton's body of work in all areas – research, teaching, and service/administration – is more than sufficient to be awarded tenure and also promoted to associate professor. He is well on his way to becoming a leading scholar in the field." *See* Dr. Weaver's September 16, 2013 External Review, attached hereto as Exhibit "N."

## G.

### DEAN BURTON AND DEPARTMENT CHAIR LAMBERT IMPLEMENTED OPENLY DISCRIMINATORY AND "PAY FOR PLAY" POLICIES WHILE SUPERVISING THE SCHOOL OF APPLIED SCIENCES AND CONSPIREDTO DENY DR. WIGGINTON TENURE

56. After members of the Department of Legal Studies voted against the award of tenure for Dr. Lambert, Dean Burton and Dr. Lambert conspired in "reorganizing" the Department of Legal Studies based upon openly discriminatory policies, "pay for play" tactics grounded in faculty willingness to "play ball," and an inherent disdain for faculty members with backgrounds as criminal practitioners.

57. Dean Burton and Dr. Lambert abandoned all express contractual requirements of tenure review while implementing a tyrannical and discriminatory rule within the School of Applied Sciences.

58. As part of these tyrannical and discriminatory policies, Dean Burton promoted a female Associate Professor to Assistant Dean of the School of Applied Sciences on or about June/July 2013. The faculty member does not hold a Ph.D. degree and her record of scholarly achievement and service is significantly less than Dr. Wigginton, for example, she has only one publication credit to her name. In

addition, despite her lack of qualifications, the newly appointed Assistant Dean was most recently appointed Interim Department Chair of the Hospitality Management Department effective June 2014.

59.     As part of the first stage of Dr. Wigginton's tenure review process, on or about November 8, 2013, the promotion and tenure committee for the Department of Legal Studies voted 5-2 in favor of granting tenure to Dr. Wigginton.  Of the five members voting for tenure, two were prior department chairs.

60.     One of the "no-vote" faculty members took the inexplicable position that Dr. Wigginton's external reviewers were weak. His external reviewers, however, are leaders within their respective fields. Furthermore, all of the external reviewers were previously approved by the University through Interim Chair Mallory and Associate Dean Mark Lofton, with the majority of the reviewers being specifically selected and approved by the University.

61.     The second faculty member voting against Dr. Wigginton's tenure and promotion, Dr. Linda Keena, reports directly to Dean Burton. Notably, Dr. Keena falsely claimed authorship credit for an article written by Dr. Wigginton's student, and was advised previously by Dr. Wigginton to correct the inaccuracy.

62.     Dr. Kenna explained her "no-vote" by stating in sum and substance, "well, you guys did not vote for Lambert for tenure, therefore, I am not voting for Wigginton."

63.     Dr. Wigginton earned a favorable recommendation from the tenure and promotion committee within the Department of Legal Studies.

64.     Shortly thereafter, on November 16, 2013, Dr. Wigginton was recognized by the University before the entire stadium at a football game for his honorable service as a Vietnam War veteran as well as his position as the Department

Graduate Coordinator for the Masters of the Criminal Justice Program and Graduate Coordinator for the Executive Cohort program.

65. In the days following that football game, and less than 90 days after beginning Chair Lambert assumed his position as Chair of the Department, Chair Lambert recommended that Dr. Wigginton be denied tenure with the University, contradicting the promotion and tenure committee for the Department.

66. At a social function held in honor of Chair Lambert on August 28, 2013, Chair Lambert was questioned by two faculty members about how he planned to evaluate faculty members eligible for tenure and promotion. He responded that he did not believe that he could effectively conduct an adequate evaluation with such a short period of time being employed at the University.

67. Chair Lambert applied criteria to the tenure application of Dr. Wigginton that is wholly inconsistent with the published criteria in the University's Tenure Policies and Procedures:

a. Chair Lambert inappropriately discounted the weight of Dr. Wigginton's external evaluators, despite the University's prior approval of their role;

b. Chair Lambert inaccurately described the results of the promotion and tenure committee for the Department as "mixed," when in fact the 5-2 vote indicated strong approval of Dr. Wigginton's tenure application; and

c. Chair Lambert ignored the University and Departmental guidelines in evaluating the strength of Dr. Wigginton's scholarship and service by wrongly excluding and disregarding multiple areas of Dr. Wigginton's achievement that should have qualified for review.

24

68.     Dr. Wigginton requested that Chair Lambert provide the reasons for his negative recommendation, to which Chair Lambert refused comment other than to say that Dr. Wigginton did not meet the University's criteria.

69.     On or about December 4, 2013, an Advisory Committee to the Dean convened in order to advise Dean Burton about Dr. Wigginton's tenure review. The Advisory Committee recommended Dr. Wigginton for promotion and tenure by a vote of 3-2.

70.     Dr. Stephen Mallory, Department of Legal Studies, was appointed to serve on the Dean's Advisory Committee. On the day prior to the vote, Dr. Mallory attempted to review Dr. Wigginton's tenure and promotion dossier, but was denied access by Associate Dean Mark Lofton, who stated he was acting on the orders of Dean Burton.

71.     On the day of the vote by the Deans' Advisory Committee, Associate Dean Lofton informed the Committee that he was changing the rules by prohibiting Committee members from speaking on behalf of their department candidates for tenure and promotion. The committee members expressed their opposition to this action. As a representative of Dean Burton, Associate Dean Lofton should not have been permitted to cast a vote.

72.     Ultimately, the Committee still voted in favor of Dr. Wigginton's tenure and promotion.

73.     On or about December 9, 2013, Dean Burton recommended that Dr. Wigginton be denied tenure with the University, contradicting the recommendation of his own Advisory Committee.

74.     Dean Burton's recommendation conflicted with his previous approval of an annual review of Dr. Wigginton's performance as Assistant Professor, which noted that Dr. Wigginton was on track for tenure and promotion.

75.     Dean Burton applied criteria Dr. Wigginton's tenure application that is wholly inconsistent with the published criteria in the University's Tenure Policies and Procedures:

a.  Dean Burton inaccurately described the voting results of the promotion and tenure committee for the Department and as the Advisory Committee to the Dean as "split," when in fact the 5-2 and 3-2 votes, respectively, were in favor of approval of Dr. Wigginton's tenure application;

b.  Dean Burton inappropriately discounted the weight of Dr. Wigginton's external evaluators despite the University's prior approval of their status as recommenders;

c.  Dean Burton cited a "lack of unanimous support" as a compelling reason to reject Dr. Wigginton's application for tenure, although there was never any such requirement in custom or in the University or Department guidelines or its custom and practice;

d.  Dean Burton incorporated and relied upon all the inherent flaws stated in Chair Lambert's recommendation;

e.  Dean Burton ignored the University's and Department's guidelines for qualifying scholarly work while analyzing Dr. Wigginton's accomplishments; and

f.  In contradiction of the University's and the Department's guidelines, Dean Burton failed to analyze Dr. Wigginton's service accomplishments and instead focused solely on the fact that Dr. Wigginton did not serve as a

reviewer for one type of academic journal, for which there is no such requirement.

76.     Meanwhile, on December 10, 2013, Dean Burton recommended an African-American female faculty member for tenure and promotion who had a significantly inferior record of scholarly achievement and service than Dr. Wigginton. In particular, this faculty member did not publish any books and only published one peer-reviewed article. Despite her lack of qualifications, her application was not as rigorously scrutinized as that of Dr. Wigginton.

### H.

### FACULTY MEMBERS FROM THE SCHOOL OF APPLIED SCIENCES SOUGHT HELP FROM FACULTY SENATE PRESIDENT MICHAEL BARNETT AND REQUESTED AN INVESTIGATION INTO DEAN BURTON'S HOSTILE WORK ENVIRONMENT AND EGREGIOUS VIOLATIONS OF THE UNIVERSITY'S POLICY

77.     On or about December 10, 2013, a large group of faculty members from the School of Applied Sciences approached Michael Barnett, president of the University Faculty Senate, requesting his advice and help in addressing the hostile work environment created by Dean Burton. Dean Burton's abusive tactics, discriminatory policies, and attempts to force out existing, qualified faculty members and leaders created an atmosphere of intimidation, fear, and distrust.

78.     Dean Burton's tyrannical polices greatly affected a female professor of social work with over 18 years of service at the University. She was specifically targeted by Dean Burton and became emotionally unstable and contemplated suicide over his harassment, abusive management style, and lack of professionalism and academic integrity relative to the process of tenure and promotion as well search and mission.

79.　The faculty group sought to petition the whole Faculty Senate to launch its own investigation into Dean Burton's policies and behavior.

80.　The Faculty Senate granted Mr. Barnett's request to meet with the group and investigate further. *See* December 10, 2013 Faculty Senate Minutes, attached hereto as Exhibit "O."

## I.

### DEAN BURTON AND CHAIR LAMBERT'S PRETEXTUAL RECOMMENDATIONS WRONGLY PERVADED THE REMAINING STEPS IN DR. WIGGINTON'S TENURE REVIEW

81.　On or about January 13, 2014, John Z. Kiss, Dean of the Graduate School at the University, recommended that Dr. Wigginton be denied tenure with the University. Dean Burton deliberately attempted to influence Dean Kiss' recommendation by sending his own flawed, discriminatory, and retaliatory recommendation denying Dr. Wigginton tenure to Dean Kiss prior to Dean Kiss' receipt of Dr. Wigginton's tenure and promotion portfolio.

82.　Despite his recommendation, Dean Kiss determined that Dr. Wigginton had fulfilled the Department criteria for promotion and tenure in the categories of both teaching and service, contradicting the findings of Chair Lambert and Dean Burton with regard to service.

83.　Dean Kiss applied criteria to Dr. Wigginton's tenure application that is wholly inconsistent with the published criteria in the University's Tenure Policies and Procedures as to the research and scholarship category:

    a.　Dean Kiss inappropriately relied on the flawed recommendations of Chair Lambert and Dean Burton in reviewing Dr. Wigginton's scholarship;

    b.　Dean Kiss wrongly discounted the weight of Dr. Wigginton's external evaluators, despite the University's prior approval of their role;

28

   c. In addition, Dean Kiss utilized a different standard of review when analyzing the external reviewers of Legal Studies professors Carl Jensen, Robert Mongue, and Linda Keena as compared to Dr. Wigginton; and

   d. Dean Kiss ignored Dr. Wigginton's authorship of textbooks and grant funding, even though they should have been properly considered under the University's and Department's guidelines. *See* Department's Guidelines for Tenure and Promotions, attached hereto as Exhibit "S."

84. When Dr. Wigginton requested that Dr. Kiss provide the reasons for his negative recommendation, Dr. Kiss refused to answer.

85. On or about March 20, 2014, Morris H. Stocks, Provost of the University, recommended that Dr. Wigginton be denied tenure with the University.

86. Provost Stocks applied criteria to the tenure application of Dr. Wigginton that is wholly inconsistent with the published criteria in the University's Tenure Policies and Procedures:

   a. Provost Stocks incorporated the flaws of Chair Lambert, Dean Burton, and Dean Kiss by relying on their recommendations;

   b. Provost Stocks inaccurately described the voting results of the promotion and tenure committee for the Department, as well as the Advisory Committee to the Dean, as "split," when in fact the 5-2 and 3-2 votes, respectively, indicated approval of Dr. Wigginton's tenure application;

   c. Provost Stocks wrongly discounted the weight of Dr. Wigginton's external evaluators, despite the University's prior approval of their role. Each and every of the five external letters were favorable and supportive of Dr. Wigginton's tenure and promotion. While Provost Stocks acknowledged that the external letters were favorable without regard to University's

guidelines and prior practice, he felt compelled to add, "serious questions were raised by the Chair and Dean as to whether the external evaluators may have had past associations with you." Provost Stocks adopted his comment wholly from Dean Burton's erroneous statement that he had "real concerns with the five external reviewers . . . as they may not be as credible as other reviewers.";

d.  It is an outrageous as well as arbitrary and capricious action for Provost Stocks and Dean Burton to attack the credibility of the outside evaluators, and in so doing, attack Dr. Wigginton's credibility and professionalism;

e.  The University's tenure policy and procedures require that each Department "identify and seek advice from evaluators outside of the University on matters within the knowledge and competence of the outside evaluators." Further, "each department shall decide how the outside evaluators shall be selected." It is undisputed that Dr. Wigginton's Department approved each of the five evaluators that provided external letters and, in doing so, accepted their knowledge of the field, professionalism, and integrity; and

f.  Provost Stocks ignored the University's and Department's guidelines for qualifying scholarly work while analyzing Dr. Wigginton's accomplishments.

87.     Soon thereafter, Dr. Wigginton initiated the University's tenure appellate process for the purpose of obtaining a hearing and decision before the University Tenure and Promotion Appeals Committee. Dean Burton and Chair Lambert, however, set out on a campaign to obstruct Dr. Wigginton's investigation into his own tenure dossier. The reasons given to Dr. Wigginton for the wrongful denial were that the Dr. Eftink first needed the permission of Dean Burton and Chair Lambert

before he could release the dossier.   Ultimately, Dr. Wigginton was wrongfully denied access to his tenure dossier by Dr. Maurice Eftink following the filing of his appeal, in bad faith and in violation of University's Tenure Policies and Procedures. After the involvement of counsel, the dossier was released and completely different reasons were given for the initial refusal to release it, namely that Dr. Eftink needed to "carefully review the policy," "needed to determine which portions of the dossier were considered confidential and remove any confidential information," and "needed to confirm at what point in the process Dr. Wigginton could be provided access."

88.     Meanwhile, on March 4, 2014, Mr. Barnett provided an update to the Faculty Senate on his investigation into the hostile work environment created by Dean Burton. Mr. Barnett indicated that he interviewed 18 faculty members of the School of Applied Sciences which revealed significant concerns about the work environment under Dean Burton's leadership.  Mr. Barnett indicated that a remediation plan would be created by Dean Burton.  In addition, a full investigative report was to be produced by Associate Provost Dr. Noel Wilkins. *See* March 4, 2014 Faculty Senate Minutes, attached hereto as Exhibit "P."

89.     During the Faulty Senate's March 4, 2014 meeting, Senator Donna Davis raised concerns regarding the appropriateness of Dr. Wilkins acting as an ombudsman in the investigation. In addition, she listed several flaws in Dr. Wilkins' investigation and requested that Dr. Wilkins' report be produced to the Faculty Senate as well as to the faculty members who came forward to complain about the hostile work environment.  To date, Dr, Wigginton is unaware of a report ever being produced by Dr. Wilkins or a remediation plan by Dean Burton. *See id.*

**J.**

## DR. WIGGINTON WON HIS APPEAL BEFORE THE UNIVERSITY'S TENURE AND PROMOTION APPEALS COMMITTEE

90.    The University Tenure and Promotion Appeals Committee held a hearing on April 14, 2014 and issued a decision on April 17, 2014. The University's Tenure and Promotion Appeals Committee found that the University acted in an arbitrary and capricious manner in regards to its review of Dr. Wigginton's tenure application, stating that "the Committee finds the negative recommendation on tenure and promotion to be arbitrary and capricious in that the University failed to consider an important aspect of the problem, namely that the candidate was led to believe by a series of supportive annual reviews that he was on track to be successful in tenure and promotion, and that the discounting of the external reviewer letters was inappropriate since the reviews were selected through the University's own actions."

91.    The University's Tenure and Promotion Appeals Committee recommended that Plaintiff's probation period be extended to allow application for tenure and promotion without arbitrary and capricious actions of the University, Chancellor Jones, Provost Stocks, Dean Kiss, Dean Burton, and Chair Lambert.

92.    Prior to the hearing, Chair Lambert was overheard talking to a faculty member in a manner that implied Chair Lambert was being coached to lie to the University's Tenure and Promotion Appeals Committee.

93.    The Appeals Committee did not require witnesses to make statements under oath during a hearing.

## K.

## UNIVERSITY CHANCELLOR JONES INEXPLICABLY REJECTED THE FINDINGS OF THE UNIVERSITY'S TENURE AND PROMOTION APPEALS COMMITTEE

94.     On May 1, 2014, despite the decision of the University's Tenure and Promotion Appeals Committee, Daniel W. Jones, Chancellor of the University, denied Dr. Wigginton's application for tenure and promotion and refused to extend Dr. Wigginton's probationary period.

95.     Chancellor Jones applied criteria to the tenure application of Dr. Wigginton that is wholly inconsistent with the published criteria in the University's Tenure Policies and Procedures:

a.  Chancellor Jones incorporated the flaws of Provost Stocks, Chair Lambert, Dean Burton, and Dean Kiss by relying on their recommendation; and

b.  Chancellor Jones ignored the University's and Department's guidelines for qualifying scholarly work while analyzing Dr. Wigginton's accomplishments.

96.     Chancellor Jones and Provost Stocks found Dr. Wigginton's service record to be at an "acceptable level." Had they found his service record to be outstanding, Provost Stocks would have, by his own analysis, recommended Dr. Wigginton for tenure. The Department of Legal Studies's tenure guidelines provide for, and Chancellor Jones and Provost Stocks agreed, that a successful tenure candidate must present an outstanding record in two of the three areas of teaching, scholarship, and service. To find Dr. Wigginton's service record less than outstanding under the guidelines and policies was without basis, arbitrary, and capricious. The University's policy and Department's guidelines defined in detail the intent and purpose of

professional and University service. In their negative recommendations, Provost Stocks and Chancellor Jones failed to identify a single element of Dr. Wigginton's service record and rather simply ranked it as acceptable. Moreover, they failed to provide a written explanation for this determination.

97. In sum, Dr. Wigginton's service record includes: serving as the Department Graduate Coordinator for the Masters of the Criminal Justice Program; serving as the Graduate Coordinator for the Executive Cohort program which is for practitioners since its inception in 2009; serving as a lecturer/instructor for the Mississippi/FBI Law Enforcement Command College, Lafayette County Law Enforcement Academy, providing training for the Oxford Police Department and also serving on their office promotion boards; serving as a resource, including providing training, to the Marshall County Sheriff's Department, Cohoma Sheriff's Department, and Olive Branch Police Department; organizing and co-hosting a Homeland Security Conference in Biloxi, Mississippi and on the University's Oxford Campus; was appointed and serves on the Board of Directors of the University of Mississippi Veterans Association, Lafayette Crime Stoppers Board, and the University of Mississippi Library Literacy Committee. Moreover, he served as an Instructor at the prestigious Federal Law Enforcement Training Center in Brunswick, Georgia. His service includes the recruitment of new students, both undergraduate and graduate, developing marketing initiatives for the Department's Master of Criminal Justice degree program, and assisting graduates of the University in gaining professional placement through his development of relationships with University alumni.

98. Evidence that Chancellor Jones' and Provost Stocks' negative recommendations are based on arbitrary and capricious determinations is most profound in their findings that Dr. Wigginton's record in scholarship/research did not rise to the

level of "outstanding." Arbitrarily and capriciously, Chancellor Jones and Provost Stocks concluded that Dr. Wigginton's co-authorship of five textbooks published by CRC and Kendell Hunt was insufficient for tenure because a Google Scholar search failed to show citations of these books.

99. These wrongful findings directly correlate with Dean Burton's negative comments Dr. Wigginton's his research and scholarship. Dean Burton stated, "this is not research/scholarship that would typically be sufficient to tenure and promotion in a research University." Chancellor Jones, Provost Stocks, and Dr. Burton, however, acted entirely in contradiction to the University's and Department's practice and policy in making this erroneous finding. The Department's tenure guidelines explicitly state that the "publication of a textbook within one's discipline through a recognized professional press . . . will be considered for tenure/promotion." The reference to CRC as the publisher and the lack of Google Scholar citations was improperly offered as a basis by Provost Stocks, following Dean Burton, to dismiss Dr. Wigginton's five textbooks publications from consideration for tenure. To suggest that CRC is not a "recognized professional press" is wholly without basis, as CRC is a renowned publisher for criminal justice and homeland security professionals, is international in scope with over 30,000 books in print, and has been publishing since 1913. Furthermore, there is no basis to utilize Google Scholar as the measure of impact. These efforts directly opposed the policy and practice as they were never been used by the Department in tenure decisions.

100. The Department's guidelines, which accept and recognize publication of textbooks as part of tenure applications, were in effect on Dr. Wigginton's hire and have not changed since.

101. Several of Dr. Wigginton's textbooks were co-authored by prior Department chairs with whom Dr. Wigginton has worked, fully supported the textbooks as scholarship, and whose own accepted tenure and promotions used the textbooks as accepted research, thereby endorsing Dr. Wigginton's textbook work as acceptable for tenure-track.

102. Chancellor Jones and Provost Stocks's rejection of policy and practice is arbitrary and capricious by definition.

103. Provost Stocks' negative recommendation stated that Dr. Wigginton has two peer/reviewed journal articles with two or three others that are either non-peer/reviewed, under review, or were accepted but never published. Chancellor Jones stated that Dr. Wigginton's peer-reviewed publications are "low and there is no evidence of scholarly impact." In fact, Dr. Wigginton has published three peer-reviewed articles and a professional journal. In addition, he has revised and resubmitted a peer reviewed article for publication and is currently working on another peer review article. Dr. Wigginton also presented ten papers at scholarly conferences, which the Department's guidelines state shall be considered of importance in the tenure decision. Further, Dr. Wigginton co-hosted training conferences with the Department of Homeland Security in Biloxi and at the University's Oxford campus. Such activities are identified expressly as evidence of "contribution to the expansion of knowledge and continuing professional vitality."

104. Provost Stocks again applied guidelines and policies not within the University's and Department's guidelines in his evaluation of Dr. Wigginton's grant activity. He rejected the significance of the grants Dr. Wigginton obtained in excess of $600,000.00 on the basis that they do not lead to "sustained research." In fact, the

Department guidelines identify "non-research funding and contracts" as items to be considered for tenure.

105.    Chancellor Jones was silent as to the significance of the grants.

106.    On June 17, 2014, Chancellor Jones terminated Dr. Wigginton's employment effective May 10, 2015.

107.    Subsequently, over 100 of Dr. Wigginton's students signed a petition to the University and established a Facebook page dedicated to urging the University to re-examine its unjustified position against Dr. Wigginton's tenure and promotion.  These students also express full support for Dr. Wigginton as a dedicated and outstanding professor and asset to the University and beyond.

## L.

### CHANCELLOR JONES ANNOUNCED A DIVERSITY INITATIVE TO UNIVERSITY FACULTY SENATE

108.    On September 16, 2014, during a University Faculty Senate meeting, Chancellor Jones revealed small details pertaining to a diversity initiative that included consultants from outside universities, including the University of Texas. When asked whether the diversity initiative would be "student-focused," Chancellor Jones explained that while portions are focused on student diversity and development, the initiative also has a "large interest in faculty and staff diversity." *See* September 16, 2014 Faculty Senate Meeting Minutes, attached hereto as Exhibit "Q."

## M.

### THE MISSISSIPPI BOARD OF TRUSTEES INSTITUTIONS OF HIGHER LEARNING DENIED DR. WIGGINTON'S REQUEST FOR REVIEW OF CHANCELLOR JONES' DECISION

109.    On December 18, 2014, on motion by Trustee Christine Pickering, seconded by Trustee Robin Robinson, with Trustee C.D. Smith participating

by phone, all trustees legally present and participating voted unanimously to deny the request for a board review of the denial of tenure for Dr. Michael Wigginton.

## N.

## THE MISSISSIPPI BOARD OF TRUSTEES INSTITUTIONS OF HIGHER LEARNING TERMINATED CHANCELLOR JONES

110.    Amidst turmoil and clashes with the University and its Board of Trustees arising out of a lack of confidence in his leadership, in or around March 2015, Chancellor Jones was dismissed from his position at the University by the State Institutions of Higher Learning.

## FEDERAL CLAIMS

## FIRST CAUSE OF ACTION

111.    Plaintiff repeats and realleges paragraphs 1 through 110 by reference as though fully set forth herein.

112.    The University's Tenure Policies and Procedures as laid out in the employee manual became part of Dr. Wigginton's employment contract under Mississippi law.

113.    Dr. Wigginton had a contractual interest in the proper execution of the tenure proceedings outlined in the University's policy guidelines, free from arbitrary and capricious determinations.

114.    The University's own Tenure and Promotion Appeals Committee found that the University acted in an arbitrary and capricious manner in regards to its review of Dr. Wigginton's tenure application.

115.    Under the leadership and direction of Dean Burton, Search Committees for faculty leadership positions, such as the Associate Dean for the School

of Applied Sciences, were assembled in manners that violated published University guidelines, as decisions were made with predetermined outcomes.

116. Numerous faculty, including Dr. Wigginton, were targeted by Dean Burton on the basis of age and race, and many were terminated or forced into retirement through harassment and intimidation. There is also a pattern and practice of retaliation against those who spoke out against Dean Burton.

117. Under the leadership and direction of Dean Burton, faculty members were denied routine extensions of tenure probationary periods due to personal illness and were subsequently terminated demonstrating a clear pattern and practice of retaliation.

118. The University, Chancellor Jones, Provost Stocks, Dean Kiss, Dean Burton, and Chair Lambert deprived Dr. Wigginton of his contractual property right in violation of the Fourteenth Amendment of the United States Constitution by making an arbitrary and capricious decision in the evaluation of his tenure application.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a. for appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

b. for appropriate compensatory damages in an amount to be determined at trial;

c. for appropriate equitable relief against Defendants;

d. for putative damages against Defendants;

e. for an award of reasonable attorney's fees and costs; and

f. for such other and further relief which this Court may deem just and proper.

## SECOND CAUSE OF ACTION

119.    Plaintiff repeats and realleges paragraphs 1 through 118 by reference as though fully set forth herein.

120.    For each of Dr. Wigginton's five years of employment, he received "outstanding" annual reviews, which noted that he was on track for tenure and promotion.

121.    These annual reviews were completed and approved by representatives of the University, including the Chair of the Department and the Dean of the School of Applied Sciences.

122.    The five reports received by Dr. Wigginton confirming that he was on track for tenure and promotion created a reasonable expectation that the trajectory of his accomplishments were sufficient to receive tenure during his sixth year of employment with the University.

123.    Dean Burton concurred with Dr. Wigginton's review for the 2012-2013 academic year.

124.    The University's own Tenure and Promotion Appeals Committee found that representatives of the University led Dr. Wigginton "to believe by a series of supportive annual reviews that he was on track to be successful in tenure and promotion."

125.    The University and Dean Burton created a reasonable expectation of tenure and promotion by Dr. Wigginton which impliedly constituted an expectation to job tenure and thus is a common law equivalent of tenure. As such, it manifested a property interest.

126.    By wrongfully denying Dr. Wigginton's tenure application and terminating him, the University and its employees deprived Dr. Wigginton of his

property interest in a reasonable expectation of tenure in violation of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a. for appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

b. for appropriate compensatory damages in an amount to be determined at trial;

c. for appropriate equitable relief against Defendants;

d. for putative damages against Defendants;

e. for an award of reasonable attorney's fees and costs; and

f. for such other and further relief which this Court may deem just and proper.

### THIRD CAUSE OF ACTION

127. Plaintiff repeats and realleges paragraphs 1 through 126 by reference as though fully set forth herein.

128. The decision and explanations related to rejecting Dr. Wigginton's tenure application included false and arbitrary statements made by Chancellor Jones, Provost Stocks, Dean Kiss, Dean Burton, and Chair Lambert regarding Dr. Wigginton's scholarly work and service that arose as a result of a stricter review standard based upon race, age, and utilization of a "diversity metrics" in performance evaluations.

129. The decision and explanations improperly were leaked to unauthorized members of the academic community by Chancellor Jones, Provost Stocks, Dean Kiss, Dean Burton, Chair Lambert, and others at the University.

130.    Dr. Wigginton's good name, reputation, honor, and integrity were damaged irreparably by these allegations.

131.    In the small community of legal studies academia, the leaks of these false statements from the University, Chancellor Jones, Provost Stocks, Dean Kiss, Dean Burton, and Chair Lambert have had a stigmatizing effect on the standing and reputation of Dr. Wigginton that negatively affected his employment opportunities.

132.    The actions of Chancellor Jones, Provost Stocks, Dean Kiss, Dean Burton, and Chair Lambert, and the University deprived Dr. Wigginton of his liberty interests in violation of the Fourteenth Amendment of the United States Constitution.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.  for appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

b.  for appropriate compensatory damages in an amount to be determined at trial;

c.  for appropriate equitable relief against Defendants;

d.  for putative damages against Defendants;

e.  for an award of reasonable attorney's fees and costs; and

f.  for such other and further relief which this Court may deem just and proper.

## FOURTH CAUSE OF ACTION

133.    Plaintiff repeats and realleges paragraphs 1 through 132 by reference as though fully set forth herein.

134.    The University engaged in a pattern and practice of discrimination on the basis of age, sex, race, and color.

135.    Dean Burton repeatedly made statements of his intent to rid the University of older professors.  In addition, faculty members wrongfully echoed Dean Burton's policies that there are too many "old, white men" on the University staff.

136.    Non-Caucasian, younger faculty members were improperly, subjected to an unequal standard of review regarding tenure and promotion as compared to Dr. Wigginton.

137.    The denial of Dr. Wigginton's tenure in May of 2014 and his subsequent termination were a direct result of the University's discriminatory practices, which included use of a stricter review standard based upon race, age, and improper "diversity metrics" in performance evaluations, violating the Fourteenth Amendment to the United States Constitution and other federal law.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.  for appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

b.  for appropriate compensatory damages in an amount to be determined at trial;

c.  for appropriate equitable relief against Defendants;

d.  for putative damages against Defendants;

e.  for an award of reasonable attorney's fees and costs; and

f.  for such other and further relief which this Court may deem just and proper.

### FIFTH CAUSE OF ACTION

138.    Plaintiff repeats and realleges paragraphs 1 through 137 by reference as though fully set forth herein.

139.    During a faculty meeting of the Department, Dean Burton threatened the faculty by stating in sum and substance, "if the faculty does not vote for tenure for Dr. Lambert as the new Department Chair, no one will get tenure in the future."

140.    Dr. Wigginton participated in the faculty discussion regarding the vote and recommended against tenure for Dr. Lambert.

141.    Ultimately, the faculty voted against tenure for Chair Lambert.

142.    Dr. Lambert's appointment as Chair of the Legal Studies Department of the University was a matter of public concern, as he was a state employee leading a division of a state university and participating in the education of students.

143.    Dr. Wigginton's denial of tenure and promotion, and subsequent termination, were in retaliation for exercising his right to free speech, violating the First Amendment of the United States Constitution.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.    for appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

b.    for appropriate compensatory damages in an amount to be determined at trial;

c.    for appropriate equitable relief against Defendants;

d.    for putative damages against Defendants;

e.    for an award of reasonable attorney's fees and costs; and

f.    for such other and further relief which this Court may deem just and proper.

## SIXTH CAUSE OF ACTION

144.    Plaintiff repeats and realleges paragraphs 1 through 143 by reference as though fully set forth herein.

145.    Dr. Wigginton is a Caucasian male born on January 1, 1949.

146.    The University engaged in a pattern and practice of discrimination on the basis of age, sex, race, and color.

147.    Dean Burton, who had authority over Dr. Wigginton's tenure and promotion application, repeatedly made statements of his intent to rid the University of older professors, evidencing a motivation to improperly consider race, age, and gender in employment decisions.

148.    In addition, faculty members wrongfully echoed Dean Burton's policies that there are too many "old, white men" on the University staff.

149.    Non-Caucasian, older faculty members improperly were subjected to an unequal standard of review regarding tenure and promotion as compared to Dr. Wigginton by the University's inappropriate use of discriminatory practices and "diversity metrics" in performance evaluations.

150.    Similarly situated employees of a different race, gender, and/or color received better treatment than Dr. Wigginton, including offers of promotion and tenure.

151.    Claimant eventually was terminated on pretextual grounds that the University's Tenure and Promotions Appeals Committee determined were arbitrary and capricious under the policies of the University.

152.    The University's discriminatory practices and the actions of Chancellor Jones, Provost Stocks, Dean Kiss, Dean Burton, and Chair Lambert directly

resulted in the denial of Dr. Wigginton's tenure in May of 2014 and his subsequent termination in violation of Title VII of the Civil Rights Act of 1964, as amended.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

    a.  for appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

    b.  for appropriate compensatory damages in an amount to be determined at trial;

    c.  for appropriate equitable relief against Defendants;

    d.  for putative damages against Defendants;

    e.  for an award of reasonable attorney's fees and costs; and

    f.  for such other and further relief which this Court may deem just and proper.

### SEVENTH CAUSE OF ACTION

153.    Plaintiff repeats and realleges paragraphs 1 through 152 by reference as though fully set forth herein.

154.    Dr. Wigginton was born on January 1, 1949.

155.    The University engaged in a pattern and practice of discrimination on the basis of age.

156.    Dean Burton, who had authority over Plaintiff's tenure and promotion application, repeatedly made statements of his intent to rid the University of older professors, evidencing a motivation to improperly consider race, age, and gender in employment decisions.

157.    In addition, faculty members wrongfully echoed Dean Burton's policies that there are too many "old, white men" on the University staff.

158.     Non-Caucasian, older faculty members were improperly, subjected to an unequal standard of review regarding tenure and promotion as compared to Dr. Wigginton by the University's inappropriate use of discriminatory practices and "diversity metrics" in performance evaluations.

159.     Similarly situated employees of a different age received better treatment than Plaintiff, including offers of promotion and tenure.

160.     Claimant was eventually terminated on pretextual grounds that the University's Tenure and Promotions Appeals Committee determined were arbitrary and capricious under the policies of the University.

161.     The University's discriminatory practices and the actions of Chancellor Jones, Provost Stocks, Dean Kiss, Dean Burton, and Chair Lambert directly resulted in the denial of Dr. Wigginton's tenure in May of 2014 and his subsequent termination in violation of the Age Discrimination in Employment Act.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.  for appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

b.  for appropriate compensatory damages in an amount to be determined at trial;

c.  for appropriate equitable relief against Defendants;

d.  for putative damages against Defendants;

e.  for an award of reasonable attorney's fees and costs; and

f.  for such other and further relief which this Court may deem just and proper.

## STATE LAW CLAIMS

## EIGHTH CAUSE OF ACTION

162.    Plaintiff repeats and realleges paragraphs 1 through 161 by reference as though fully set forth herein.

163.    Claimant fully complied with all relevant provisions of the Mississippi Torts Claim Act, Mississippi Code § 11-46.

164.    On or about March 9, 2015, Dr. Wigginton served a Notice of Claim on all parties in this matter.

165.    On March 6, 2015, Dr. Wigginton delivered a Notice of Claim to Chancellor Jones.

166.    On March 9, 2015, Dr. Wigginton delivered a Notice of Claim to Dr. Hank M. Bounds, Commissioner, Board of Trustees of State Institutes of Higher Learning, and Jim Hood, Attorney General.

167.    The University's Tenure Policies and Procedures, as laid out in the employee manual, became part of Dr. Wigginton's employment contract under Mississippi law.

168.    Dr. Wigginton had a contractual interest in the proper execution of the tenure proceedings outlined in the University's policy guidelines, free from arbitrary and capricious determinations.

169.    The University's own Tenure and Promotion Appeals Committee found that the University acted in an arbitrary and capricious manner in regards to its review of Dr. Wigginton's tenure application.

170.    Dr. Wigginton taught between three and four classes per semester, in addition to maintaining his additional responsibilities as Department Graduate Coordinator for the Masters of the Criminal Justice Program and Graduate Coordinator

for the Executive Cohort program, volunteer positions that he undertook as no other professor was willing. For five years, Dr. Wigginton handled all of the coordinator responsibilities for the two programs, including recruiting prospective students, scheduling classes, selecting text books, assigning instructors, and soliciting advertising funds. Dr. Wigginton wrongfully was held to a standard different than any other faculty that received tenure and promotion, all of whom taught only two classes per semester. Further, Dr. Wigginton's colleagues in the Department who received tenure and promotion were all given credit for textbook authorship and for presentations at state and regional conferences, whereas Dr. Wigginton's scholarship and accomplishments were ignored or minimized in bad faith.

171. In violation of the University's Tenure and Promotion guidelines, Dr. Wigginton never received written notification from the Chair or Dean of any amendments to tenure standards.

172. Dean Burton wrote a 2014 article, *How to Be a Successful Administrator*, published in the Journal of Contemporary Criminal Justice, which expressed a preference for and warning to outsiders coming into a new institution. This article stated in relevant part, "[d]espite gleaning the department or institution's publicly stated truths, the reality is that those around, above, and below you may in fact not zealously aspire to anything in particular for the department, college, or institution!" Dean Burton further expressed his clear bias against faculty with former practitioner and/or agency experiences: For *productive* departments at research universities, hiring talented faculty members is not usually a problem. In departments undergoing transition, or possessing more applied and vocationally orientated criminal justice faculty members, however, there may be challenges. Despite some faculty still believing that criminal justice is a 'practitioner-based' and 'agency-driven' discipline,

the *type of university* one serves will determine the academic 'orientation' of the faculty one recruits. Recent research by Tewksbury and Vito (2012) indicates that among criminal justice and criminology faculty, those individuals with former practitioner and/or agency experiences (e.g., law enforcement) will *publish less* and generate *fewer scholarly contributions* over the course of their careers versus traditional research orientated faculty with no practitioner experience." *See* Burton, Jr., Velmer S., *How to Be a Successful Administrator*, 30 J. CONTEMP. CRIM. JUST. 409 (2015), attached hereto as Exhibit "R."

173. Echoing these apparent ideals, on or about April 24, 2015 Chair Lambert expressed a clear disdain and bias toward legal studies professors such as Dr. Wigginton with law enforcement backgrounds, noting a "lack of sophistication" and "one-dimensional" character. Incredulously, Chair Lambert, who was responsible for guiding the curriculum of the Department, further criticized the Legal Studies department for not focusing heavily enough on Cyber Crime. *See id.*

174. In a retaliatory action, the University, acting under the direction of Dr. Lambert, removed Dr. Wigginton's name credit from recent federal grant proposals without properly notifying Dr. Wigginton.

175. The University deprived Dr. Wigginton of his contractual property rights in violation of Section Fourteen of the Mississippi Constitution making arbitrary and capricious determinations while evaluating his tenure application.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

     a. for appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

b.  for appropriate compensatory damages in an amount to be determined at trial;

c.  for appropriate equitable relief against Defendants;

d.  for putative damages against Defendants;

e.  for an award of reasonable attorney's fees and costs; and

f.  for such other and further relief which this Court may deem just and proper.

### NINTH CAUSE OF ACTION

176.    Claimant repeats and realleges paragraphs 1 through 175 by reference as though fully set forth herein.

177.    For each of Dr. Wigginton's five years of employment, he received "outstanding" annual reviews, which noted that he was on track for tenure and promotion.

178.    These annual reviews were completed and approved by representatives of the University, including the Chair of the Department and the Dean of the School of Applied Sciences.

179.    The five reports received by Dr. Wigginton stating that he was on track for tenure and promotion created a reasonable expectation that the trajectory of his accomplishments was satisfactory to receive tenure during his sixth year.

180.    The University's own Tenure and Promotion Appeals Committee found that representatives of the University had led Dr. Wigginton "to believe by a series of supportive annual reviews that he was on track to be successful in tenure and promotion."

181.    The University created a reasonable expectation of tenure and promotion by Dr. Wigginton that manifested as a property interest.

182.    The University and its employees deprived Dr. Wigginton of his property interest in a reasonable expectation of tenure in violation of Section Fourteen of the Mississippi Constitution when they denied his tenure application.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.    for appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

b.    for appropriate compensatory damages in an amount to be determined at trial;

c.    for appropriate equitable relief against Defendants;

d.    for putative damages against Defendants;

e.    for an award of reasonable attorney's fees and costs; and

f.    for such other and further relief which this Court may deem just and proper.

### TENTH CAUSE OF ACTION

183.    Claimant repeats and realleges paragraphs 1 through 182 by reference as though fully set forth herein.

184.    For each of Dr. Wigginton's five years of employment, he received "outstanding" annual reviews, which noted that he was on track for tenure and promotion.

185.    These annual reviews were completed and approved by representatives of the University, including the Chair of the Department and the Dean of the School of Applied Sciences.

186.    The five reports received by Dr. Wigginton stating that he was on track for tenure and promotion created a reasonable expectation that the trajectory of his accomplishments was satisfactory to receive tenure during his sixth year.

187.    The University's own Tenure and Promotion Appeals Committee found that representatives of the University had led Dr. Wigginton "to believe by a series of supportive annual reviews that he was on track to be successful in tenure and promotion."

188.    The University induced Dr. Wigginton to detrimentally rely on the representation that he would receive tenure and promotion.

189.    The University breached its contract with Dr. Wigginton when his application for tenure and promotion was denied.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

g.  for appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

h.  for appropriate compensatory damages in an amount to be determined at trial;

i.  for appropriate equitable relief against Defendants;

j.  for putative damages against Defendants;

k.  for an award of reasonable attorney's fees and costs; and

l.  for such other and further relief which this Court may deem just and proper.

Dated:      June 10, 2015

Respectfully submitted,

Flicker, Garelick & Associates, LLP
Keith L. Flicker, Esq.
*Pro hac vice admission to be filed*
45 Broadway
New York, New York 10006
Tel. No. (212) 319-5240
kflicker@flickergarelick.com

Mike Farrell, Miss. Bar 5147
Mike Farrell, PLLC
*Counsel for Plaintiff*
210 East Capitol Street
Jackson, Mississippi 39201
Tel. 601-948-8030