IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

MICHAEL WIGGINTON, JR.                                        PLAINTIFF

V.                                        CIVIL ACTION NO. 3:15CV093-NBB-RP

THE UNIVERSITY OF MISSISSIPPI,
CHANCELLOR DANIEL W. JONES,
PROVOST MORRIS H. STOCKS,
DEAN JOHN Z. KISS, DEAN VELMER BURTON,
AND CHAIR ERIC LAMBERT                                        DEFENDANTS

## **MEMORANDUM OPINION**

This cause comes before the court upon the individual defendants' Renewed Motion for

Judgment as a Matter of Law and, Alternatively, for New Trial and to Alter and Amend

Judgment. Upon due consideration of the motion, response, exhibits, and applicable authority,

the court is ready to rule.

### Factual and Procedural Background

The plaintiff, Dr. Michael Wigginton, filed this lawsuit against the University of

Mississippi and named administrators following the denial of Wigginton's tenure and promotion

application and his subsequent termination from the University. A five-day jury trial was held

wherein witness testimony and evidentiary documents were presented. The court submitted two

of Dr. Wigginton's original claims to the jury – an age discrimination claim and a substantive

due process claim. The jury found in favor of the University on the age discrimination claim and

for Dr. Wigginton against the individual defendants on the due process claim, specifically

finding that each individual defendant's decision to deny Dr. Wigginton's tenure and promotion

application was arbitrary and capricious and "literally irrational." The jury found the defendants

liable to Dr. Wigginton for $18,000 in lost wages and $200,000 in past and future pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.

Dr. Wigginton was hired in 2008 as an assistant professor in a tenure-track position in the University's Department of Legal Studies. Neither his employment agreement nor subsequent agreements contained any language excluding the incorporation of external documents, and the parties agreed that the tenure and promotion review process was governed by the University, School of Applied Sciences, and Department Guidelines. The guidelines from the School and Department were designed to supplement the University Guidelines and provide more specific guidance regarding the criteria to be used to evaluate a professor's application for tenure and promotion. Under the University Guidelines, tenure applicants are evaluated on the quality of their research and scholarly activity, teaching, and service. All applicants are required to assemble a dossier summarizing his or her relevant activity and work product demonstrating satisfaction of these three factors.

The University Guidelines outline the procedure required of all tenure-track professors which begins with a five-year probationary period prior to tenure eligibility. The guidelines provide:

> Each candidate must serve a probationary period of five years of continuous or accumulated full-time employment at The University of Mississippi in a tenure-track professorial position….The sixth year shall be the year of formal review….A person who is not awarded tenure during his or her sixth year of service shall be given a terminal contract for his or her seventh year of service….Consideration for tenure shall be mandatory.

Once a professor becomes eligible for tenure and promotion, he or she is to be notified in writing by May 15 of that year and is to meet with the chair of the department no later than July 1 of that year to discuss the submission of the dossier. The applicant also provides the chair with a list of five external reviewers from which the chair is to

select three as well as two external reviewers from the chair's own list. The applicant is to submit the dossier no later than September 1 of that year.

Upon submission of the applicant's dossier, the tenured and associate professors of the department meet and vote as to whether the applicant should be granted tenure and promotion. This vote is provided to the appropriate department chair who reviews the tenure application and makes a recommendation to the appropriate school dean. The school dean also receives a recommendation from a separate advisory committee. The school dean reviews the application and makes a recommendation to the graduate school dean who in turn makes a recommendation to the provost.

The Tenure and Promotion Review Committee reviews the application to ensure that the process has been properly conducted and submits its findings to the provost. The provost then makes his recommendation. In the event of a negative recommendation from the provost, the applicant has five days to appeal and request a hearing from the Tenure and Promotion Appeals Committee, which will further assess whether the negative recommendations were based on impermissible grounds, including being arbitrary and capricious. Following a formal hearing, the Appeals Committee's findings are sent to the Chancellor, who makes the final recommendation to the Board of Trustees of the Mississippi Institutions of Higher Learning ("IHL Board"). The IHL Board makes the ultimate decision to award tenure.

The testimony and evidence produced at trial showed that Dr. Wigginton complied with this process, timely preparing and submitting a dossier which summarized his relevant teaching, service, and scholarly activity to demonstrate why he was entitled to tenure and promotion. Dr. Wigginton's dossier included five years of glowing reviews

from his superiors which, he asserts, confirmed that he had met and exceeded the requirements necessary for an award of tenure and promotion.

The tenured members of the Department of Legal Studies voted five to two in favor of a grant of tenure and four to two in favor of promotion.[1]  Despite the faculty vote in favor of Dr. Wigginton, Defendant Eric Lambert, Chair of the Department of Legal Studies, recommended against granting tenure and promotion.  His recommendation was considered by the Dean's Committee, which voted three to two in favor of tenure and promotion.  Like Lambert, Defendant Velmer Burton, Dean of the School of Applied Sciences, who is no longer employed by the University, recommended, against the favorable recommendations of the faculty and committee, that Dr. Wigginton should not receive tenure.  Defendant John Kiss, Dean of the Graduate School, followed suit and likewise recommended against the grant of tenure and promotion.

Dr. Wigginton's application was then reviewed by the Tenure and Promotion Review Committee, which questioned the recommendations of Defendants Lambert, Burton, and Kiss as to arbitrariness and capriciousness and issued a report making no official finding in this respect.  Defendant Morris Stocks, the Provost, who is no longer in that position, followed the other defendants in recommending against a grant of tenure and promotion.

Dr. Wigginton then filed a request for a hearing with the Tenure and Promotion Appeals Committee.  In its report to the Chancellor dated April 17, 2014, the Appeals Committee noted that in reviewing the defendants' recommendations against tenure and promotion, it considered the following definition of "arbitrary and capricious":  that "an

---

[1]One tenured professor was an assistant professor, not an associate, and therefore not included in the latter vote as to whether Dr. Wigginton should be promoted.

action [is arbitrary and capricious] if the agency entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Docket 172-15. The Committee then reported its findings as follows:

> In this context, the Committee felt that the agency (the University) as represented by the two department chairs preceding Dr. Lambert during Dr. Wigginton's probationary period had provided annual evaluations indicating satisfactory or excellent progress towards tenure and promotion for the previous 5 years, leading Dr. Wigginton and, the Committee felt, any reasonable person to expect that they would be granted tenure and promotion. The Committee also found that the final selection of external reviewers was entirely within the University's control, and that the selection of a reviewer from Dr. Wigginton's dissertation committee, entirely at odds with university policy, was a University decision. As such, the **Committee finds the negative recommendation on tenure and promotion to be arbitrary and capricious** in that the University failed to consider an important aspect of the problem, namely that the candidate was led to believe by a series of supportive annual reviews that he was on track to be successful in tenure and promotion, and that the discounting of the external reviewer letters was inappropriate since the reviewers were selected through the University's own actions. The Committee recommends that Dr. Wigginton be given a written explanation of how the department's tenure and promotion guidelines are interpreted and that an extended probation period be given to him so that he can demonstrate his ability to meet those expectations.

*Id.* (Emphasis added). Disregarding the Tenure and Promotion Appeals Committee's finding that Dr. Wigginton's tenure and promotion review process had been performed in an arbitrary and capricious manner, Defendant Chancellor Dan Jones, who is no longer the Chancellor, followed suit with the other defendants and recommended against tenure and promotion to the IHL Board. Jones issued a letter on June 17, 2014, advising Dr. Wigginton that his employment would be terminated on May 10, 2015. Jones also denied Dr. Wigginton's request and the Committee's recommendation that Dr. Wigginton's probationary period be extended for a year.

Dr. Wigginton subsequently brought the instant lawsuit alleging a number of claims, two of which were ultimately submitted to the jury after a five-day trial: an age discrimination claim and a substantive due process claim. The jury found for the University on the age discrimination claim but found that the individual defendants had acted arbitrarily and capriciously in denying tenure and terminating from the University and were liable for $18,000 in lost wages and $200,000 in past and future pain and suffering. The defendants now renew their motion for judgment as a matter of law notwithstanding the verdict of the jury and also ask for the alternative relief of a new trial or a vacating or reduction of the damages award.

## Standard of Review

Federal Rule of Civil Procedure 50(b) allows a defendant to renew his motion for judgment as a matter of law following a verdict for the plaintiff. Judgment as a matter of law after the conclusion of trial should be granted when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have had a legally sufficient evidentiary basis to find for a party on that issue[.]" Fed. R. Civ. P. 50(a)(1). "It goes without saying that the evidence must be viewed in the light most favorable to the nonmovant." *Montano v. Orange County, Tex.*, 842 F.3d 865 (5th Cir. 2016). "Moreover, consistent with the role of the jury under the Seventh Amendment to the Constitution, it is more than well-established that all reasonable inferences are drawn in favor of the nonmovant, with the credibility of witnesses and weight of the evidence being within the sole province of the jury." *Id.* The court "accord[s] great deference to the jury's verdict when evaluating the sufficiency of the evidence." *Baltazor v. Holmes*, 162 F.3d 368, 373 (5th Cir. 1998). The verdict is reversed "only if the evidence points

'so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Id.* (quoting *Boeing v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969)).

A district court may grant a new trial under Federal Rule of Civil Procedure 59(a) when such action is necessary "to prevent an injustice." *Seibert v. Jackson County, Miss.*, 851 F.3d 430, 438 (quoting *United States v. Flores*, 981 F.2d 231, 237 (5th Cir. 1993)). "The decision to grant or deny a motion for new trial is a matter for the trial court's discretion; [and the appellate court] will reverse its ruling only for an abuse of discretion." *Seibert*, 851 F.3d at 438. "A trial court should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence." *Id.* "In other words, the movant must show 'an absolute absence of evidence to support the jury's verdict.'" *Id.* (quoting *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998)).

<u>Analysis</u>

**Renewed Motion for Judgment as a Matter of Law**

*Substantive Due Process*

"The protections of the Due Process Clause, whether procedural or substantive, only apply to deprivations of constitutionally protected property or liberty interests." *Klingler v. Univ. of S. Miss.*, 612 F. App'x 222, 227 (5th Cir. 2015). "Without such an interest, no right to due process accrues." *DePree v. Saunders*, 588 F.3d 282, 289 (5th Cir. 2009). A successful claim for deprivation of substantive due process requires two showings in the context of public employment: (1) that the plaintiff possessed the aforementioned property interest or right and (2) that the public employer's depriving of

that interest was arbitrary and capricious. *Stark v. Univ. of S. Miss.*, 8 F. Supp. 3d 825, 841 (S.D. Miss. 2014) (citing *Lewis v. Univ. of Tex. Med. Branch at Galveston*, 665 F.3d 625, 630 (5th Cir. 2011)).

The Supreme Court has held that in order "to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it [or] . . . a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). The Court has also held that a "person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).

The Supreme Court has acknowledged that an implied contract right precluding arbitrary state interference may qualify as a property interest protected by the Due Process Clause[2] but has also made clear that "[p]roperty interests. . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Roth*, 408 U.S. at 577. The Fifth Circuit has held accordingly, stating that "[c]onstitutionally protected property interests are created and defined by understandings that stem from an independent source such as state law" or contract. *Klingler*, 612 F. App'x at 227; *Martin v. Mem. Hosp. at Gulfport*, 130 F.3d 1143, 1147 (5th Cir. 1997).

The Fifth Circuit has stated, "In general, we have recognized that a property interest is created where the public entity has acted to confer, or alternatively, has created conditions which infer, the existence of a property interest by abrogating its right to

---

[2] *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 220-21 (1985).

terminate an employee without cause." *Muncy v. City of Dallas, Tex.*, 335 F.3d 394, 398 (5th Cir. 2003). The court noted, "This abrogation may take the form of a statute, rule, handbook, or policy which limits the condition under which the employment may be terminated." *Id.* (citing *Henderson v. Sotelo*, 761 F.2d 1093, 1096 (5th Cir. 1985)). "Ultimately, however, the question of whether a property interest exists is an individualized inquiry which is guided by the specific nature and terms of the particular employment at issue and informed by the substantive parameters of the relevant state law." *Id.*

In Mississippi, "employee manuals become part of the employment contract, creating contract rights to which employers may be held." *Klinger*, 612 F. App'x at 227 (citing *Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 345 (5th Cir. 2006)); *Stark*, 8 F. Supp. 3d at 840. Mississippi courts have held that when an employer "publishes and disseminates to its employees a manual setting forth the proceedings which will be followed in the event of an employee's infraction of rules, and there is nothing in the employment contract to the contrary, then the employer will be required to follow its own manual in disciplining or discharging employees." *Bobbitt v. The Orchard, Ltd.*, 603 So. 2d 356, 357 (Miss. 1992).

The substantive component of the Due Process Clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). The Fifth Circuit has explicitly acknowledged that the substantive process due a non-tenured applicant for tenure and promotion, is "the exercise of professional judgment, in

a non-arbitrary and non-capricious fashion." *Spuler v. Pickar*, 958 F.2d 103, 107 (5th Cir. 1992).

The defendants move the court to set aside the jury's verdict and grant judgment as a matter of law in their favor based on their position that Dr. Wigginton had no protected property interest in a grant of tenure because under Mississippi law "there is no legitimate expectation of employment for a nontenured faculty member that creates a protected interest." *Whiting v. Univ. of S. Miss.*, 62 So. 3d 907, 915 (Miss. 2011). Dr. Wigginton does not dispute this point but instead accurately asserts that under Mississippi law, non-tenured employees' "contract rights do constitute enforceable property interests." *Klingler*, 612 F. App'x at 227 (citing *Univ. of Miss. Med. Ctr. v. Hughes*, 765 So. 2d 528, 536 (Miss. 2000)).

Dr. Wigginton asserts that he presented sufficient evidence to establish a constitutionally protected contractual property interest in the fair administration of his tenure and promotion review process which was required to be free from irrationality and arbitrary or capricious decisions, and further that his tenure and promotion review process was not, in fact, free from irrationality and was conducted in an arbitrary and capricious manner, thus depriving him of his constitutionally protected interest. The jury agreed.

The court finds that based upon the evidence presented at trial, it is clear there existed mutually explicit understandings between Dr. Wigginton and the University which were memorialized in the University, School, and Department's tenure policies and guidelines and incorporated through Dr. Wigginton's employment agreement, which contained no language excluding external documents. In accordance with these mutually

explicit understandings, Dr. Wigginton was eligible for and entitled to a fair merit-based inquiry free from irrationality as to whether he should receive tenure and promotion following his satisfactory completion of the five-year probationary period. The Fifth Circuit has recognized that a plaintiff may have a property interest in a rational application of a university merit-based policy. *Harrington v. Harris*, 118 F.3d 359, 368 (5th Cir. 1997).

Based on the applicable authority and the evidence produced at trial, it is clear that Dr. Wigginton successfully established an enforceable and constitutionally protected contractual property interest as contemplated by substantive due process jurisprudence which entitled him to a fair tenure and promotion review process based on professional judgment free from irrationality and arbitrary and capricious decision-making. Dr. Wigginton has satisfied the first prong of a successful substantive due process claim.

The court also finds that because Dr. Wigginton's claim is that of a contractual property interest entitling him to a fair tenure and promotion review process – as opposed to a claim of entitlement to a grant of tenure itself – the defendants' argument that only the final decision makers – that is the Chancellor in nominating for tenure and the IHL Board in actually awarding the grant of tenure – could be held liable is without merit. Each of the defendants was involved in the tenure and promotion review process and each owed Dr. Wigginton a review and recommendation based on professional judgment free from irrationality and arbitrary and capricious decision-making. In this context it is irrelevant that the Chancellor and the IHL Board are the final decision makers.

The court now examines whether sufficient evidence was presented to support Dr. Wigginton's claim that the defendants deprived him of this constitutionally protected

property interest. "If state action is so arbitrary and capricious as to be irrational, its infringement on a constitutionally protected interest may violate substantive due process rights." *Neuwirth v. Louisiana State Bd. of Dentistry*, 845 F.2d 553, 558 (5th Cir. 1988). The jury was instructed accordingly and found that Dr. Wigginton's denial of tenure and promotion was literally irrational. The court finds there was sufficient evidence presented to warrant such a verdict by reasonable jurors.

As mentioned, Dr. Wigginton received glowing reviews from his superiors during his five-year probationary period at the University. While this is insufficient under applicable authority to establish an expectation of tenure amounting to a property interest,[3] it does provide evidence of the arbitrary and capricious nature of Dr. Wigginton's tenure promotion and review process, and such was noted by the University's own Tenure and Promotion Appeals Committee. The Committee stated:

> [T]he Committee felt that the agency (the University) as represented by the two department chairs preceding Dr. Lambert during Dr. Wigginton's probationary period had provided annual evaluations indicating satisfactory or excellent progress towards tenure and promotion for the previous 5 years, leading Dr. Wigginton and, the Committee felt, any reasonable person to expect that they would be granted tenure and promotion . . . . As such, the Committee finds the negative recommendation on tenure and promotion to be arbitrary and capricious in that the University failed to consider an important aspect of the problem, namely that the candidate was led to believe by a series of supportive annual reviews that he was on track to be successful in tenure and promotion.

Docket 172-15.

The jury also considered testimony which suggested that the defendants baselessly discounted the overwhelmingly positive opinions of external reviewers, stating the reviewers were of poor quality and had tenuous conflicts of interest. The external

---

[3] *See, e.g.*, *Whiting*, 451 F.3d at 345 ("[T]he Mississippi Supreme Court has held that positive annual reviews do not serve to generate a property interest in tenure.") (citing *Wicks v. Miss. Valley State Univ.*, 536 So. 2d 20, 23 (Miss. 1988)).

reviewer selection process was entirely in the control of the School of Applied Sciences and in accordance with the University Guidelines; also the external reviewers were approved by the Office of the Dean of the School.

The jury was also presented with the University's Tenure and Promotion Appeals Committee's findings as to this matter. The discounting of the reviewers was specifically noted by the Committee as one of its reasons for finding an arbitrary and capricious recommendation against tenure. The Committee stated:

> The Committee also found that the final selection of external reviewers was entirely within the University's control, and that the selection of a reviewer from Dr. Wigginton's dissertation committee, entirely at odds with university policy, was a University decision. As such, the Committee finds the negative recommendation on tenure and promotion to be arbitrary and capricious in that the University failed to consider an important aspect of the problem, namely . . . that the discounting of the external reviewer letters was inappropriate since the reviewers were selected through the University's own actions.

Docket 172-15. A reasonable juror could take note of the apparent disingenuousness in the defendants' discounting the opinions of the reviewers and ignoring the Committee's findings, as the facts suggest that each individual defendant failed to exercise professional judgment and instead simply rubber-stamped the recommendations of the other defendants.

The defendants argue that Dr. Wigginton failed to demonstrate sufficient scholastic achievement and impact during his probationary period to warrant an award of tenure. The evidence, however, showed that conflicting standards for assessing scholarship among the University, School, and Department policies were applied arbitrarily. When Dr. Wigginton was hired, the University provided him with documents entitled "The University of Mississippi Tenure Policies and Procedures" ("University Guidelines"), "The University of Mississippi School of Applied Sciences Guidelines and

Procedures for Annual, Tenure, Promotion, and Post-Tenure Reviews" ("School

Guidelines"), and "Legal Studies Guidelines for Tenure and Promotion" ("Department

Guidelines").  The evidence showed that throughout his probationary period Dr.

Wigginton was repeatedly informed by his direct supervisor that he should follow the

Department Guidelines.

> The Department Guidelines provided in pertinent part:
>
> Evidence [of scholarly activity] will include books or journals published by commercial or university presses; articles in refereed or other scholarly professional journals with state, regional, national, or international reputations; papers presented at scholarly conferences; discussant and/or chair at conferences, seminars, workshops, symposiums, etc.; organizer of professional workshops or seminars; editorial responsibilities within one's discipline; publications of manuals, text chapters, monographs or media materials; research grants and nonresearch funding and contracts.  The publication of a textbook within one's discipline through a recognized professional press and articles published within the genres of one's specialization in professional journals will be considered for tenure/promotion.

Docket 172-8.  Testimony revealed, however, that when Dr. Wigginton's application for

tenure and promotion was evaluated by the defendants, they used other guidelines

regarding scholarly activity.  These later-applied "School Guidelines" provided in

pertinent part:

> Within the School of Applied Sciences, research and scholarly activity is demonstrated primarily through the publication of research papers in refereed, academic journals with international, national, or regional reputations and publication of scholarly books by commercial or university presses.  Other research activity may also be manifest in:  non-refereed journals; professional journals; proceedings papers; presentations at scholarly meetings; editorial work for refereed academic journals; research grants; contracts which support continued research; and other work relevant to the candidate's academic discipline.

Docket 172-7.

The application of the more restrictive School Guidelines provided the defendants with an alleged basis to discount some of Dr. Wigginton's scholarly work such as textbook publication as well as certain journal articles and research grants. The evidence also showed that certain defendants utilized an even narrower view of scholarship than that contemplated by the more restrictive School Guidelines.

It was further revealed that defendants expected Dr. Wigginton to participate in and make presentations at specific conferences not mentioned in the guidelines. For instance, Defendant Lambert's recommendation against tenure asserts that Dr. Wigginton should have been required to participate in more American Society of Criminology and Academy of Criminal Justice Sciences events; yet Dr. Wigginton was never advised of this very specific expectation during his five-year probationary period, and many of the conferences Dr. Wigginton did attend were discounted by the defendants though Dr. Wigginton was led to believe these would be credited toward his scholarship.

Testimony also revealed that the defendants relied on Dr. Wigginton's Google Scholar score as a statistic to determine whether an applicant should be granted tenure and promotion. The Google Scholar score requirement is not mentioned in the applicable guidelines, and the jury heard testimony from several witnesses suggesting that no applicant for tenure and promotion in the Department of Legal Studies had ever been held to said standard.

The defendants provided no explanation as to why the School Guidelines were applied exclusively over the Department Guidelines. The defendants simply argued that it was Dr. Wigginton's responsibility to be familiar with all guidelines and determine which ones applied. Dr. Wigginton testified that he was repeatedly informed by his

direct supervisor during his probationary period that the Department Guidelines applied and that accordingly he strictly adhered to the requirements for tenure and promotion for professors in the Department. The Department Guidelines were drafted specifically for reference by professors within the Department. Despite the defendants' position that Dr. Wigginton was responsible for complying with all guidelines, common sense dictates that guidelines designed specifically for the Department would be the logical guidelines for a professor within that Department to follow as opposed to the School Guidelines, especially considering he was directed to follow those guidelines by his direct supervisor.

Reasonable jurors could and did find disingenuousness in the defendants' actions regarding the arbitrary application of potentially conflicting guidelines as well as certain specific expectations found nowhere in the guidelines such as participation in certain conferences and the Google Scholar score matter and could determine that the defendants simply manufactured an excuse to deny Dr. Wigginton tenure, forcing him out of the University to make way for new staff.[4]

Evidence was also presented which revealed that certain defendants characterized the faculty majority votes in favor of Dr. Wigginton's tenure and promotion as "split," suggesting that these defendants did so to discredit the recommendation of the Department of Legal Studies faculty vote in support of Dr. Wigginton. The defendants argue that the votes in fact *were* "split," and that it was not inappropriate to characterize them as such. While the votes were not unanimous, nevertheless they were majority votes in favor of tenure and promotion. To characterize such votes as "split" in the

---

[4] Testimony suggested that Defendant Dean Burton, who came into the University toward the end of Dr. Wigginton's probationary period and is no longer employed by the University, repeatedly expressed his desire to terminate Dr. Wigginton and that he intended to move the makeup of the department away from "practitioner" professors toward more academic professors.

defendants' recommendations against tenure could appear to a reasonable juror as a deliberate attempt to discredit these majority votes in Dr. Wigginton's favor.

In sum, sufficient documentary evidence and testimony were presented to the jury which suggested, inter alia, that the individual defendants discounted a majority faculty vote in favor of tenure, arbitrarily discounted relevant scholarship, held Dr. Wigginton to conflicting standards and undocumented expectations without explanation and did so against its own internal Review and Appeals Committees' concerns and recommendations in this regard. The evidence and testimony presented also showed that the defendants improperly discounted the legitimacy of Dr. Wigginton's external reviewers although the reviewers were pre-approved by the University, and further, that they deliberately ignored the Tenure and Promotion Appeals Committee's explicit finding that the recommendations against granting Dr. Wigginton tenure and promotion had been based on arbitrary and capricious grounds. The jury agreed with that finding. In accordance with the "especially deferential" standard of review afforded jury verdicts challenged by a motion for judgment as a matter of law,[5] the court finds the evidence presented at trial more than sufficient to support the jury's unanimous decision that the defendants failed to exercise professional judgment and made arbitrary and capricious decisions which had "no rational connection between the known facts and the decision or between the found facts and the evidence." *Neuwirth*, 845 F.2d at 558.

### *Qualified Immunity*

Qualified immunity protects state actors "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

---

[5] *Carley v. Crest Pumping Technologies, LLC*, 890 F.3d 575, 577 (5th Cir. 2018).

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When qualified immunity is asserted, as has been done here, the court must make two determinations. The court considers whether the evidence demonstrates a violation of a constitutional right. *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013). The court additionally must determine whether the right at issue was clearly established at the time of the defendants' alleged misconduct. *Id.* The constitutional right must be sufficiently clear to put a reasonable official on notice that certain conduct violates that right. *Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998).

In the present case, as to whether the constitutional right at issue was clearly established at the time of the violation, Dr. Wigginton accurately notes that in 1987 the Fifth Circuit recognized that a state employee has a substantive due process right to be free from arbitrary and capricious deprivations of state employment related property interests. *Honore v. Douglas*, 833 F.2d 565, 568 (5th Cir. 1987). Then in 1992 the Fifth Circuit recognized that the substantive process due tenure applicants with a property interest is the "exercise of professional judgment, in a non-arbitrary and non-capricious fashion." *Spuler*, 958 F.2d at 107.

A public employee may demonstrate a constitutionally protected property interest by showing that it is founded on a "legitimate claim of entitlement based on mutually explicit understandings." *Honore*, 833 F.2d at 568 (quoting *Roth*, 408 U.S. at 577). The existence of such an interest must be determined by reference to state law. *Muncy*, 335 F.3d at 398. As addressed under the substantive due process analysis above, "[u]nder Mississippi law, non-tenured employees do not have a legitimate expectation of continued employment; [b]ut their contract rights do constitute enforceable property interests, and employee manuals become part

of the employment contract, creating contract rights to which employers may be held." *Klingler*, 612 F. App'x at 227.

Dr. Wigginton was contractually obligated to apply for tenure and promotion, resign, or be terminated. Dr. Wigginton's employment agreement incorporated mutually explicit understandings regarding a formal set of policies and procedures by which his tenure and promotion application would be reviewed, thus establishing an enforceable and protected property interest to a fair tenure and promotion review process.

In light of the relevant case law, a reasonable official would have been aware that he cannot make irrational decisions and fail to exercise professional judgment in denying an application for tenure and promotion. The court finds that the constitutional right at issue here was clearly established at the time of the defendants' misconduct. The defendants should have been aware that they were required to exercise professional judgment and make a rational decision that was not arbitrary and capricious. *If for no other reason, the defendants should have been aware of their duties based simply on the fact that the University has established two administrative bodies, the Tenure and Promotion Review Committee and the Tenure and Promotion Appeals Committee, created for the* **specific purpose** *of ensuring that the tenure and promotion review process is free of arbitrary and capricious decision-making. The former committee questioned the arbitrary nature of the process as applied to Dr. Wigginton's application, and the latter explicitly found arbitrary and capricious decision-making; yet the defendants ignored these findings and each recommended against a grant of tenure and promotion.*

Having determined that this case involves a clearly established constitutional right of which a reasonable official would have known, the court will now consider whether the evidence

demonstrates a violation of that right. This analysis has already been set forth above. The jury has resolved the question of fact as to whether the individual defendants arbitrarily and capriciously deprived Dr. Wigginton of a constitutional property right, unanimously finding that the defendants failed to exercise professional judgment and made decisions that were literally irrational. The court has found the evidence legally sufficient to support the verdict.

In *Honore v. Douglas*, the Fifth Circuit noted that "a federal court is generally not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Honore*, 833 F.2d at 569. The court added, however, that "[t]his measure of judicial restraint . . . does not require slavish deference to a university's arbitrary deprivation of a vested property right." *Id.* This court finds, in accordance with the applicable case law, the evidence presented at trial, and the jury's verdict, that the individual defendants arbitrarily deprived Dr. Wigginton of a clearly established constitutional right of which a reasonable official would have known. The individual defendants are, therefore, not entitled to qualified immunity. The court finds that the defendants' motion for judgment as a matter of law is denied.

### Motion for a New Trial

As alternative relief to their motion for judgment as a matter of law, the defendants seek a new trial based on allegedly improper jury instructions. The defendants argue that the court failed to instruct the jury of the appropriate standard by which it could find a deprivation of a due process right. They further argue that the court erred in answering a written question proposed by the jury regarding the definition of "due process."

"The district court has broad discretion in formulating the jury charge." *Deines v. Tex. Dept. of Protective and Regulatory Services*, 164 F.3d 277, 279 (5th Cir. 1999). The court's instructions to the jury, considered as a whole, must instruct the jurors so that they understand

the issues to be tried and are not misled. *Frosty Lands Foods v. Refrigerated Transport*, 613 F.2d 1344, 1348 (5th Cir. 1980). "[A] challenge to jury instructions 'must demonstrate that the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.'" *Deines*, 164 F.3d at 279 (quoting *Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1216 (5th Cir. 1995)).

The court instructed the jury, in part, that Dr. Wigginton had "a right free from that [tenure and promotion] process being made in an arbitrary and capricious way and free of irrationality on the part of the defendants." Citing *Lewis v. Univ. of Tex. Med. Branch at Galveston*, 665 F.3d 625, 630 (5th Cir. 2011), the defendants assert that to be "arbitrary and capricious," a decision must have "no rational connection between the known facts and the decision or between the found facts and the evidence." Shortly after the instruction quoted above, the court further instructed as follows: "To be arbitrary and capricious, the Defendant Jones' decision must have been literally irrational. There must have been no rational connection between the known facts and the decision or between the found facts and the decision." The court added, "And the plaintiff must prove, by a preponderance of the evidence, that the Defendant Jones' decision not to nominate the plaintiff for tenure was irrational."

The defendants argue that the initial instruction quoted above is an inaccurate statement of the law and that the court improperly instructed regarding the defendants' exercise of professional judgment. The defendants admit that the court later expounded on the original instruction regarding the arbitrary and capricious standard and actually included the very language the defendants argue should have been included. The defendants nevertheless maintain that the jury was improperly instructed. They fail to note, however, that the majority of the instructions given in this case were in fact proposed by the defendants and that the court

specifically gave the defendants' own requested substantive due process instruction and business judgment instruction.

The court finds that the initial instruction that Dr. Wigginton had "a right free from that [tenure and promotion] process being made in an arbitrary and capricious way and free of irrationality on the part of the defendants" is not an incorrect statement of the law; and even if it were, the additional instruction expounding on the arbitrary and capricious standard would cure any confusion. The court, however, finds no legitimate basis for confusion. "There is no error if the instructions, when taken together, properly express the law applicable to the case, even though an isolated clause is inaccurate, ambiguous, incomplete, or otherwise subject to criticism." *Vicksburg Furniture Mfg., Ltd. v. Aetna Cas. and Sur. Co.*, 625 F.2d 1167, 1169 (5th Cir. 1980).

The court also finds no merit to the defendants' argument that the court's response to the jury's inquiry regarding due process did not accurately state the law or address the jury's confusion. During jury deliberations, the jury sent a note to the court reading, "Clarify exactly what is due process." The court responded in writing: "Due process is a legal term and I consider basically that the words themselves in their context are their own best definition. Thank you and please continue your deliberation." The court finds that it provided an appropriate response and that there is no merit to the defendants' argument.

The defendants have not demonstrated that the charge as a whole creates substantial and eradicable doubt as to whether the jury received proper guidance for their deliberations. Accordingly, the court finds that the jury was properly instructed. The defendants' alternative motion for new trial based on improper jury instructions is denied.

**Motion to Amend Judgment**

The defendants also move the court to vacate the damages awarded by the jury due to an alleged lack of evidentiary basis or alternatively to reduce the award to nominal damages only. The jury awarded Dr. Wigginton $100,000 in past pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life and $100,000 in future pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life. The defendants argue that the evidence presented was insufficient to support the jury's award of damages for pain and suffering. The court disagrees.

The Fifth Circuit has stated that it "review[s] with deference damage awards based on intangible harm, because the harm is subjective and evaluating it depends considerably on the demeanor of witnesses." *Tureaud v. Grambling State Univ.*, 294 F. App'x 909, 916 (5th Cir. 2008) (quoting *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 487-88 (5th Cir. 2001)). "It is true that compensatory damages for emotional distress may only be awarded when specific evidence of actual harm is introduced." *Williams v. Trader Publishing Co.*, 218 F.3d 481, 486 (5th Cir. 2000). The Fifth Circuit "has held, however, that the testimony of the plaintiff alone may be enough to satisfy this requirement." *Id.* (citing *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1046 (5th Cir. 1998); *Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996)).

In *Williams v. Trader Publishing Co.*, the Fifth Circuit upheld a compensatory damages award of $100,000 for emotional distress based solely on the plaintiff's testimony regarding severe emotional distress, sleep loss, severe weight loss, and beginning the habit of smoking. *Id.* Again recognizing that "a plaintiff's testimony alone may be sufficient proof of mental damages," the Fifth Circuit affirmed a $140,000 award based solely on the plaintiff's testimony

in *Tureaud v. Grambling State University* for emotional distress damages to a law enforcement officer who accused his employer of retaliatory discharge. *Tureaud*, 294 F. App'x at 916.

In *Forsyth v. City of Dallas*, the Fifth Circuit affirmed emotional anguish awards of $100,000 and $75,000 respectively for two police officers who successfully sued the city for First Amendment retaliation when they were transferred from the intelligence unit to night uniformed patrol after making allegations of illegal wiretapping within the police department. *Forsyth*, 91 F.3d at 774. The $100,000 award was based on the plaintiff's testimony "that she suffered depression, weight loss, intestinal troubles, and marital problems, that she had been sent home from work because of her depression, and that she had to consult a psychologist." *Id.* The $75,000 award was based on the co-plaintiff's testimony "that he suffered depression, sleeplessness, and marital problems." *Id.* In affirming the awards, the court stated, "Judgments regarding noneconomic damages are notoriously variable; we have no basis to reverse the jury's evaluation." *Id.*

In the present case, Dr. Wigginton testified that he relocated to Oxford, Mississippi, to pursue the tenured faculty position with the University of Mississippi and set down roots and built a life in the community. He lived here with his family for seven years and was ultimately forced to uproot his life and relocate because of the defendants' wrongful actions. After the defendants' actions and attempting to mitigate his damages and provide for his family, prior to moving, Dr. Wigginton commuted 730 miles round trip to Troy University in southern Alabama at the age of 65 years old. The commute required him to spend multiple nights per week in a motel away from his family.

Dr. Wigginton further testified that he had never been seriously ill before the events giving rise to this action. He testified that he took the only position he could find, which

happened to be 365 miles away from home.  He testified that he had commuted to Troy for approximately a year when his wife found him unconscious on his bedroom floor after he had become seriously ill with a bacterial infection that resulted in a week-long hospitalization. During the hospitalization, he suffered cognitive, cardiological, and pulmonary difficulties.

Dr. Wigginton testified that his wrongful termination from the University constituted a devastating blow to himself and his family.  He stated that he felt hurt and betrayed by officials in whom he had placed his trust.  He testified that the stress associated with the defendants' actions eventually had a detrimental effect on his health.

Dr. Wigginton also testified about the burden of moving his family to Louisiana and selling his home in Oxford in 2017.  During this time Dr. Wigginton taught an online course for Tulane University because he could not find another job.  At the time of trial, he had been teaching at the University of Southern Mississippi for approximately three months in a non-tenured position.  As the position was non-tenured and the university's budget was in a significant deficit with cuts likely to be made, Dr. Wigginton continued to suffer stress regarding his employment situation.

The court finds that Dr. Wigginton's testimony provides sufficient evidence to support the jury's awards for past and future pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.  The evidence indicated that Dr. Wigginton's health significantly deteriorated after his wrongful termination from the University.  A significant deterioration in health suggests a strong possibility of future pain and suffering, in addition to past pain and suffering.  The jury was free to reach this conclusion and to attribute the deterioration in Dr. Wigginton's health to the deprivation of his due process rights.

The Fifth Circuit does "not reverse a jury verdict for excessiveness except on the strongest of showings," and to determine whether a remittitur is in order, the court applies the "loosely defined 'maximum recovery rule.'" *In re Parker Drilling Offshore USA, LLC*, 323 F. App'x 330, 333 (5th Cir. 2009). "This judge-made rule essentially provides that [the court] will decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction." *Id.* (quoting *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1344 (5th Cir. 1990)). The awards in the cases cited above were for past compensatory damages alone. As the jury in the present case awarded $100,000 for past damages and $100,000 for future, the court finds that upholding these awards is not inconsistent with the maximum recovery rule.

In light of Fifth Circuit precedent affirming similar awards in similar cases and repeatedly upholding such awards based solely on the plaintiff's testimony, this court finds that the defendants' motion to amend the judgment is without merit. The court will neither vacate the jury's award nor reduce it. The motion is denied in its entirety.

<u>Conclusion</u>

Based on the foregoing analysis, the court finds that the defendants' Renewed Motion for Judgment as a Matter of Law and, Alternatively, for New Trial and to Alter and Amend Judgment is denied. A separate order in accordance with this opinion shall issue this day.

This, the 1st day of April, 2019.


/s/ Neal Biggers
NEAL B. BIGGERS, JR.
UNITED STATES DISTRICT JUDGE